STATE *v.* LONG..

STATE v. GEORGE W. LONG.

*Indictment for Assault—School Teacher—Whipping Scholar—Malice, Definition of—Instructions.*

1. If a teacher uses excessive force or inflicts such punishment upon a pupil as to produce permanent injury, or if he inflicts punishment, not in the honest performance of duty, but, under the pretext of duty, to gratify malice, he is guilty of an assault.
2. Malice against mankind is wickedness, a disposition to do wrong, a diabolical heart, regardless of social duty and fatally bent on mischief, while particular malice is ill-will, grudge, a desire to be revenged on a particular person.

STATE *v.* LONG.

3. On the trial of a school teacher for an assault upon his pupil, the trial Judge instructed the jury that defendant was guilty if he inflicted a permanent injury or if he inflicted it from malice, "which means bad temper, high temper, or quick temper"; *Held*, that there was error both because of the erroneous definition of malice and the failure to distinguish between general and particular malice, and because it cannot be known whether a verdict of guilty rendered under such instruction was based upon the finding that a permanent injury was inflicted or that there was malice as defined by the trial Judge.

INDICTMENT for assault, tried before *Meares, J.*, at June Term, 1895, of the Circuit Criminal Court of the Eastern District for MECKLENBURG county.

The defendant was a school teacher and had whipped the prosecuting witness, a boy 13 years of age, with a hickory switch or sprout, inflicting injuries from which the boy suffered some weeks.

Zeb Gardener testified : "I am about thirteen years old, and was going to school to Mr. Long last February. He whipped me with a hickory withe about three feet long and as large at the butt end as my thumb—whipped me for shooting a boy with a small cross-bow. The boy held up his hand for me to shoot at and I shot him with a small arrow, which had a pin in the end of it. We were not mad at each other. The bow would not shoot more than three steps. I did not hear Mr. Long tell me, before I shot, not to do so. He struck me seven times with the hickory and twice with the other switch. I used crutches for more than a month to walk with. The switch he whipped me with was a sprout. Had been on good terms with Mr. Long always before that time. At the time he whipped me he said I was a good boy, had never given him trouble before, but that I had disobeyed him and he would have to whip me."

. Mrs. Miller testified : "I am the grand-mother of Zeb Gardener. He was thirteen years old last January. Zeb came home on Monday, the day of the whipping ; did not eat much dinner, and complained that his leg hurt him, where Mr. Long had whipped him. There was one cut on his leg three or four inches long—two others not so long, and were not bleeding ; his stocking was bloody. This was 12 o'clock ; saw it again that night ; badly bruised between the cuts, which were located on the calf of the leg. Monday night he moaned all night ; had to prop up his leg in bed. Tuesday night he complained and moaned all night. I waked up his father and told him about Zeb's condition. Zeb had his head thrown back and had violent pains and trembled like a leaf; gave him laudanum and other things ; teeth chattered ; sat up with him all night ; did not seem to know anything until Friday morning ; he was continually crying, 'Oh, my leg !' It was about a week before he could get up ; his leg was propped up all the time ; after that he went about on crutches ; he complains sometimes now ; used laudanum and smoked sugar on his leg ; on Wednesday used vaseline and carbolic salve. Long acknowledged that he cut several times in the same place. Zeb said his knees and breast hurt him ; said pain was also in his head and jaw and affected his breathing."

Jonas Gardener testified : "I am father of Zeb. I first knew of the whipping Tuesday night. He was ailing before that, but I did not know what was the matter. On Tuesday night he had spasms, jerking his head back and gritting his teeth ; kept up until one hour before day. His leg was swollen and bloody ; water was oozing out. He lay on the pallet for thirteen days. I then brought him to town court week ; never walked at all for fifteen days, then he used crutches for something like a month. Long was at my house and said he was high strung and liable to

get mad. Said he was a little off on that day and was mad. He said this in the presence of Zeb's grandmother. I sent for a doctor on Thursday and he would not come. Long said he whipped Zeb because he was disobedient; that he never had had trouble with him before and that he was a good boy."

The defendant, G. W. Long, introduced in his own behalf, testified: "I am a school teacher. Have been teaching for some six or eight years. Zeb Gardener, the prosecutor, was one of my pupils. On Monday morning (the day of the whipping) at recess, as I was walking out of the school room on the play ground, I saw Zeb have a cross-bow and an arrow with a pin stuck in the end of it. I told him not to shoot on the ground, as he might injure some of the children. I was very close to him, and, as I spoke, he lowered the cross-bow from an attitude of shooting, which satisfied me that he heard what I said. On my return, I was told that he had shot one of the boys in the hand, not inflicting any great injury. I sent for Zeb and the boy that was shot, and whipped them both with the same switch. Before whipping Zeb, I told him that I was very sorry that I had to whip him; that he. had always been a good boy and had never given me trouble before, but that I had expressly commanded him not to shoot the bow on the ground, and that he had, almost immediately, violated my instructions. He said that he knew he had done wrong, and was willing to take the whipping. I struck him two licks with a small switch that I had in the school room, and the switch broke. I sent one of the boys out for another switch. He returned with two; both of them were hickory sprouts of one year's growth; the largest one, at the butt end, was about the size of my little finger, and probably three feet long. I trimmed the knots off of it carefully and limbered it up with my hand. I

then struck Zeb some six or seven licks with this switch; did not intend to and do not think I struck him too hard. I whipped him around the legs; struck him on the calf of the leg (which was only protected by a stocking) uninten- tionally. He made no outcry until I struck him the last lick, and when he made the first sign of pain I stopped. I then whipped the other boy with the same switch, but not quite as hard as I whipped Zeb. I do not know whether I whipped him with the large switch or the small one. Mr. Gardener, Zeb's father, went to the school house afterwards and got possession of both switches, and I have not seen them since. He made no complaint that day to me and came back to school Tuesday and appeared to be as well as usual. On Wednesday I heard that his father wanted to see me, and I went to the house and saw Zeb lying on a pallet. His leg was swollen and had three whelps on the calf. In one of them the skin was broken and it appeared to be irritated—had a bluish, reddish look, as if he had caught cold in it. I told Mr. Gar- dener I did not know I had hit the boy hard enough to inflict this wound, and that probably the reason the skin was broken in this place was because the hickory had struck twice in that place. I deny ever having told Gar- dener that I was off and was mad. I did not twist the switch under my foot, and was not in the least angry. I saw no blood oozing out of the wound on the day he was whipped or when I saw him on Wednesday at his home. I had no malice or ill will toward the boy; he had never given me trouble before, and I only whipped him because I felt it necessary to do so to maintain discipline in the school, and also thought he needed punishment for diso- beying my orders."

At the close of the evidence, the defendant requested the court to charge the jury as follows:

"1st. That, in order to convict the defendant, the jury must be convinced beyond a reasonable doubt, or fully satisfied, that the injury was inflicted not for punishment or for correction of the boy, because of his disobedience, but from malice towards him, or that the injury is permanent.

"2nd. That there is no evidence of the malice.

"3rd. That there is no evidence that the injury is of a permanent character, such as the law makes it criminal to inflict.

"4th. That the defendant had the right to punish the boy, Zeb Gardener, for disobedience, for any violation of the rules of the school, and had the right, also, to whip him ; and, even if the jury believe that the punishment was excessive or cruel, they cannot convict unless they also find that the defendant was actuated by malice towards the boy or unless the defendant inflicted a permanent injury upon him.

"5th. That, if the jury find that the injury is one from which the boy, Zeb Gardener, will recover, and that the defendant was not actuated by malice, but punished Gardener because of his disobedience, they will acquit the defendant.

"6th. That the judgment of the school-teacher as to the amount of punishment inflicted for any disobedience of his pupils is presumed to be correct and the burden is on the State to satisfy the jury, beyond a reasonable doubt, that the teacher (the defendant in this case) was either actuated by malice towards his pupil, Zeb Gardener, or that the injury inflicted is permanent."

His Honor refused to give the second and third prayers for instructions and remarked that the first, fourth, fifth, and sixth prayers had been substantially given in his gen-

eral charge to the jury, and they were, therefore, not read separately to the jury.

The court charged the jury generally, as follows : "A school teacher has the authority to inflict such punishment upon his pupils as, in his judgment, may be necessary for purposes of correction and, although he may be at fault in his judgment and inflict punishment of too great severity, in fact amounting to cruelty, yet he cannot be convicted, unless he inflicts some permanent injury upon his pupil, or unless he inflicts some punishment from malice. There are, however, only two cases in which a school teacher can be convicted of a criminal assault when he is inflicting punishment upon his pupils. That is, where he acts from malice or when he inflicts a permanent injury upon the pupil. Malice means bad temper, high temper or quick temper, and if the jury find that the injury was inflicted upon Zeb Gardener from malice, as above defined, then they should convict the defendant. Or, if the jury should find that there was no such malice and the defendant inflicted a permanent injury upon Zeb Gardener, his pupil, they should convict the defendant, even though he was, at the time, punishing the pupil for some disobedience or some infraction of the rules of the school. The State must satisfy the jury, beyond a reasonable doubt, that the defendant either acted from malice or that he inflicted a permanent injury upon Zeb Gardener before they can convict him."

The defendant excepted to his Honor's refusal to give the instructions prayed for by him, and further excepted because his Honor charged the jury that there was evidence of malice, and also evidence that permanent injury had been inflicted upon the prosecutor, Zeb Gardener. The defendant further excepted because his Honor charged the jury that malice meant bad temper, high temper or quick

temper, and if the defendant inflicted the injury upon the prosecutor from bad temper, high temper or quick temper, he would be guilty as charged in the indictment.

There was a verdict of guilty. The defendant moved for a new trial. The motion was overruled and the defendant excepted, the said motion being based upon the exceptions above set forth.

There was a judgment upon the verdict; the defendant excepted and appealed.

*The Attorney General*, for the State.

*Messrs. Burwell, Walker & Cansler*, for defendant (appellant).

FAIRCLOTH, C. J.: The defendant was convicted for whipping a school child about 13 years of age. The authority of teachers to correct their pupils for disobedience and the limitations thereon have long since been settled.

1. If they inflict such punishment as produces or threatens lasting mischief, they are guilty.

2. If they inflict punishment, not in the honest performance of duty, but under the pretext of duty to gratify malice, they are guilty. *State* v. *Pendergrass*, 2 Dev. & Bat., 365.

His Honor charged the jury: "1. That if the defendant inflicted a permanent injury he was guilty. 2. Malice means *bad* temper, *high* temper or *quick* temper, and if the injury was inflicted from malice, as above defined, then they should convict the defendant." This definition of malice is imperfect and misleading. It may exist without temper, and it may not exist although the act may be done whilst under the influence of temper, bad, high or quick. It is well defined in *Brooks* v. *Jones*, 11 Ired., 260: "Gen-

eral malice is wickedness, a disposition to do wrong, a black and diabolical heart, regardless of social duty and fatally bent on mischief." This is malice against mankind. "Particular malice is ill will, grudge, a desire to be revenged on a particular person." This distinction was not explained to the jury, but the term "malice" was given to them with an erroneous definition. Whether the jury rendered a verdict of guilty, on the ground of permanent injury, which was a good ground if they so believed, or on the ground of malice, "as above defined," we do not and cannot know, and we must direct that the matter be further inquired of. The error was in the mistaken definition of malice. As the case goes back, we need not discuss the other matters argued before us. The rule forbidding the use of excessive force applies to school teachers and all in like positions, as it does to all other persons.

New Trial.