### STATE v. WILLIAM BALDWIN.

(Filed 17 May, 1910.)

**1. Murder—Malice—Mitigating Circumstances—Manslaughter.**

While malice, in the popular sense of personal hatred or ill-will, is not always required to convict of the crime of murder, and may be said to exist whenever there has been an unlawful and intentional homicide without excuse or mitigating circumstance, its presence is always necessary to that crime, whether in the first or second degree. Revisal, sec. 2631.

**2. Same—Passion.**

Manslaughter is the unlawful killing of another without malice, and under given conditions this crime may be established, though the killing has been both unlawful and intentional, as when the passion, if aroused by provocation which the law deems adequate, displaces malice and is regarded as a mitigating circumstance reducing the degree of the crime.

**3. Same—Previous Ill-will—Accidental Meeting.**

When previous ill-feeling has existed between the parties, and they meet accidentally and a fight ensues in which one of them is killed, malice will not be presumed from the existence of the old grudge unless the circumstances of the case make it appear.

**4. Same—Evidence.**

While there is evidence in this case tending to show animosity between the deceased and the defendant on trial for his murder, the idea of malice is repelled when it is established that the deceased accidentally met the prisoner, when the prisoner was peaceably going on his way, and hailed him for the purpose of arresting him on an invalid warrant, overtook him and unjustifiably made the arrest with force, turning the prisoner back and shoving him twice before he made any active resistance, and threatened the prisoner with a pistol before he did the fatal firing; and the question on the issue of manslaughter is alone presented.

**5. Murder—Malice—Evidence — Expressions of Prisoner—Provocation.**

The prisoner being tried on the charge of murder was asked by witness, within five minutes after he had fired the fatal shot, "You have about fixed yourself to be hung, haven't you?" to which the prisoner replied, "I have done what I intended to do, and I don't care what in the hell they do with me": *Held,* the question was well calculated to arouse the prisoner, and the conversation at the time and place it occurred, and under the attendant facts, should be regarded as the not unnatural expression of an angered man who had passed through a fatal encounter with his fellowman, and should be referred to the occurrence itself, and not construed as an expression of a preconceived definite purpose to kill.

APPEAL from *Councill, J.,* at Fall Term, 1909, of WATAUGA.

Indictment for murder. There was evidence on the part of the State tending to show that on 6 July, 1909, the prisoner shot and killed J. W. Miller, deceased, who was at the time the town marshal of Blowing Rock, N. C.; that prisoner was going out of town towards Linville, when the deceased, who was fifty steps behind, called to prisoner, overtook him, and, claiming to have a warrant for prisoner, arrested him and started him back towards town; that he shoved the prisoner twice to hurry him along, and the second time the prisoner pulled loose and, turning, shot and killed deceased; that deceased had no valid warrant at the time, and was armed with a billy and pistol, and himself fired once, and one or two of the cartridges in his pistol showed that they had been snapped on.

Henry Coffey, an eye-witness, testified for the State, in part, as follows: "Live at Blowing Rock. I was present at time the prisoner shot and killed Miller, the deceased. The shooting occurred near shop in Blowing Rock. I walked with the deceased to shop just before the shooting. The place where the shooting occurred is beyond the shop a little. When Miller and I were going towards the shop we saw the prisoner come out of the shop and walk off; went in road toward Linville. At this time Baldwin was about fifty yards from Miller and I. Miller then holloed and said: "Hold, Mr. Baldwin; I have got a warrant for you.' Mr. Baldwin continued to walk on, did not look back; Miller walked on after him and overtook him in a few steps. When Miller overtook Baldwin, he pulled out a paper. [Here defendant excepts.] Mr. Baldwin then said: 'Go off and let me alone; I have started to leave here.' Then Mr. Miller pulled out his 'billy' like he would use it if Baldwin resisted; then Mr. Miller put his hand on Baldwin or give him a little shove and started toward Blowing Rock. While they were walking along Baldwin reached his hand to his left bosom and then seemed to drop it to his side. Mr. Miller about this time kinder give him a little shove and told Baldwin to walk along a little faster. About this time Baldwin got away from Miller some five or six feet and made a little circle, moving to the front of Miller; then presented a pistol on Miller and snapped it at him. At the time Baldwin drew his pistol and snapped it, Miller seemed to be trying to put his paper away and draw his pistol. Mr. Baldwin drew his pistol first; Miller drew his a second after, as well as I could tell. When Baldwin snapped his pistol at Miller, Miller was then drawing his pistol. Immediately after the pistol snapped, Baldwin then shot [indicates time by slapping hands]. After first shot, Baldwin continued

in rapid succession to shoot until he fired four shots. After the four shots by Baldwin, I then heard the report of another pistol; it sounded louder and was a few seconds after the four shots I first heard that Baldwin fired. Miller fired the last shot; had pistol in his right hand, but put up his left hand to his right and shot. He only shot once; did not hit Baldwin. When Miller fired at Baldwin, then Baldwin caught Miller by the coat sleeve and began to beat Miller over the head with the pistol. [Pistol is shown witness. and he says it looks like the Baldwin pistol—it is the same pistol.] Baldwin struck Miller some four to five licks over the head. The guard on the pistol is bent. The Baldwin pistol is an S. & W. double-action, rapid fire, caliber 32. When Baldwin was beating Miller over the head with the pistol, Miller holloed, 'Help me, boys!' and I said, 'Come on, boys, and let's stop this.' Mr. Robbins then came out in the yard, then turned and went back. I went on and took hold of Baldwin's pistol and took it from him and put it in my pocket. I took hold of Baldwin's arm, and then Mr. Johnson took hold of Miller and led him off. Baldwin was taken in charge by the officers. I went to Miller and helped to carry him home. Saw Dr. Parleir with Miller. This shooting occurred at Blowing Rock, N. C., the 6th July, and some time after 4 P. M., in daylight. The pistol Baldwin used was a six-shooter, and had five shells shot out and one snapped on. When Miller first got up to Baldwin he just kinder put up his hand and touched Baldwin and said, 'I have a warrant for you,' and took out a paper. Miller never struck Baldwin before Baldwin began firing."

Cross-examined: "I had seen Baldwin that day at Blowing Rock, prior to the shooting. Next saw Baldwin when he came out of the shop. I just struck up with Miller as he was going out toward the shop. Miller asked me to walk with him. Miller overtook Baldwin in twenty yards from shop. Miller said Baldwin had gone out about the shop of Ed. Robbins and was going to hang out there that night, and that he was going to arrest him and take him to jail." Witness described billy that Miller carried. "Miller's pistol had one chamber shot and three cartridges snapped on. Miller was fighting all he could. When I took hold of Baldwin and took pistol from him, I stood where I could see it all. Never knew anything against the deceased as to truth."

Redirect: "No injury on Baldwin—a little smut on his cheek."

With a view of showing malice, and with a view of showing that the killing was premeditated and deliberate, D. S. Lee was examined by the State, and testified:

"I know prisoner when I see him. I know the deceased man, Miller. I heard a conversation between the deceased and prisoner on Friday evening before this killing on Tuesday, the 6th of July last. Mr. Miller and I met in front of Mr. Holsouser's store and were talking, and Baldwin came up. When Mr. Baldwin came up Mr. Miller said: 'All I need to arrest a man with is the billy I have in my hand.' Mr. Baldwin then said: 'If you ever attempt to arrest or hit me with that billy I will kill you.' Mr. Miller said: 'I hope I will never have any cause to arrest you; but if I do, you or any other man, this is all I need to arrest you.' Baldwin then said: 'By God, if you ever attempt to arrest me with it, you or I will one die.' I think this is the expression. By this time both Miller and Baldwin seemed to be a little mad and Baldwin walked off, and Miller continued to talk to me. When Baldwin came up to where Miller and I were talking he was very abrupt."

For like purpose, M. T. Shoemaker was introduced, and testified: "I saw the prisoner in about five minutes after the shooting occurred. I went up to where the shooting occurred. When I got there Henry Coffey said, 'Mr. Baldwin has shot Mr. Miller and killed him,' and I said to Mr. Baldwin, 'You have about fixed yourself to be hung, haven't you?' and Baldwin replied and said, 'I have done just what I intended to do, and I don't care what in the hell they do with me.'"

William Edmisten testified: "I accompanied defendant to jail from Blowing Rock. I asked him who shot first. He said, 'I did.' I said, 'You got yourself in trouble.' He said, 'I do not care; there would not have been anything of it if Miller had not followed him (me)'"—Baldwin.

Cross-examined: "Miller said he shot once. Showed me how he shot. Could not shoot any more on account of being wounded. I heard Miller tell Baldwin to leave town. He said Baldwin concealed whiskey and, if he did not leave, he would get warrant and arrest him. The evening of the shooting Baldwin told Miller he would be damned if he would go."

For the defendant, it appeared that the warrant under which deceased professed to act was void, and the court so held.

Defendant, a witness in his own behalf, testified to the occurrence as follows: "I am defendant. Live at Blowing Rock. Am 57 years old. Lived at Blowing Rock since 1865. Have been working for Ritter Lumber Company for last two years—only returned to Blowing Rock three or four days before the trouble with Miller. I returned home because my wife was sick. I went to Blowing Rock on Tuesday; had been to Boone, and was returning home. I got to Blowing Rock about 12

o'clock. I rested and was looking for a man to go on a Mr. Greene's bond. I was on the porch of the drug store at Blowing Rock, and Mr. Miller came up and ordered me off. When he did this, he talked ill to me. After he ordered me off, I sat there about five minutes. Frank Robbins, Dr. Rabey and others were present. I walked away and left Miller standing there. After I left I went home and laid down on the bed; I was sick. William Edmisten came to my house while I was on the bed and told me I had better leave; that they were about to issue a warrant for me. I told him I was not able to leave. My wife was sick at the time. I had no one to leave with her. After Edmisten left I got up and left. I told the 'old woman' I guess I had better go. I started to my work at Ritter Company's. I got as far as Robbins' shop, and there came up a shower of rain and I went in to keep from getting wet. Stayed there a while, 15 or 20 minutes. I then started off. I then heard some one holloaing behind. I just kept walking on. First thing I knew a man took me by the coat collar, and I looked around and saw it was Miller. I then turned around and said: 'I am going to my work—let me go; I have started, as you told me to do.' Miller then pulled his billy out of his pocket; and when he did so I jerked loose from him, and he then drew his pistol out of his pocket. I then jerked mine out and told him to stop. He then threw his pistol in my face and I threw mine in his face and Miller's pistol snapped; and I then began shooting and fired about four shots in rapid succession. [Identified pistol as his.] During the time I was firing, the deceased was trying to shoot me. I never heard Miller shoot but once; that was last shot. I heard Miller snap once, this before I fired. Held pistol on me all time I was shooting, trying to shoot me. He held pistol in one hand. After last shot he grabbed me. We faced each other until Miller grabbed me. I did not know I had hit him until the firing was all over. We were right up to each other when Miller shot. Powder burned me in face. Henry Coffey took my pistol from me right after shooting. After shooting was over took me to Mr. Holsouser's store. Mr. Lentz and Robbins in shop while shooting was going on. I did not know who called me, and I walked on. I never had had any trouble with Miller. I shot Miller because he threw his pistol in my face and would not stop when I told him, and I thought he was going to kill me. We were right up together when pistols were drawn and shooting occurred. After the shooting, Miller caught hold of me and I tapped him a few times over the head. During this time he was trying to shoot me or trying to hit me with the pistol. Miller and I were perfectly friendly—no trouble be-

tween us. I deny the conversation that Lee testified to about billy, also threats made about Miller. I do not use liquor—have not touched it in thirteen or fourteen years."

Defendant admitted having been sentenced to the penitentiary many years ago for stealing money, and testified that he was not guilty and had been pardoned; and, further, that deceased had the reputation of being a dangerous, violent man, using weapons on people when in difficulties with them.

Frank Robbins, for defendant, testified: "Was not present at shooting. Present at drug store time of conversation between Miller and Baldwin. I heard Miller tell Baldwin he must leave town. Baldwin said he was sick and his wife was sick, and he had not done anything to leave for, and he would not be run off from home; that he had not done anything to leave, and he was not going to do so. Baldwin then walked off and Miller asked the mayor, Mr. Sudderth, for a warrant, or demanded one. Said if he could not get a warrant there he would go where he could get one. Miller seemed a little wrought up, or little mad, when he was talking and when he called for the warrant."

C. A. L. Holsouser, for defendant, testified: "Some four or five days before the killing I heard a conversation between Miller and Baldwin. Baldwin said: 'If you ever hit me with that billy, I will kill you.' Miller said: 'If I can't arrest you with that, I got something in my pocket that I can arrest you with; and if it will not do, I have a Winchester rifle I can get you with.' "

There was other evidence that the deceased was a resolute and determined man and officer, high-tempered and dangerous when aroused, and when he had animosity towards one. George Sudderth, the mayor of the town, testified, among other things, "that Henry Coffey told me he saw only a part of the difficulty; that he went into the shop and peeped out, etc.; that he knew Will Baldwin; that he had the reputation of being a good kind of man and attended to his business; that Miller was a man of high temper—so said; he had the reputation of being a man who would use a weapon in a difficulty."

Moses Johnson, for defendant, testified, telling about the difficulty between Baldwin and Miller: "Saw Baldwin with pistol; then shooting followed. After the shooting was over, I went up. Miller had pistol presented on Baldwin when I got there. Saw bullet-hole in shop. I think I got to parties first after shooting. One could kill a man with billy—it weighs about a pound."

J. B. Clarke testified: "Know defendant. Except charge against Baldwin going to pen., he is man of very good character—a harmless fellow and good worker."

J. W. Farthing testified: "Knew deceased. Character of Miller was, he was a hasty man; liked to exhibit his firearms, would make motion like drawing weapon when things did not suit him. He was hasty; drank while he was in Boone."

George W. Robbins testified: "Reputation of Miller was that he was a man who would carry out his purposes regardless of consequences. Would arrest a man regardless of danger."

Cross-examined: "Was a brave officer. Would go when called to do so. Never considered the danger."

The prisoner was convicted of murder in the first degree. Motion for new trial by prisoner on the ground that the court should have held that, upon the entire testimony, the prisoner could not be convicted of murder in the first degree. Over-ruled and exception. There was judgment on the verdict, and prisoner excepted and appealed.

*Attorney-General* and *G. L. Jones* for the State.
*L. D. Lowe, M. N. Harshaw* and *T. A. Love* for defendant.

HOKE, J., after stating the case: We have given the appeal the extended and careful consideration that a case of this character should always receive, and are of opinion that, on the facts as they now appear, the element of malice, required by the law as a constituent feature of the crime of murder, has been negatived, and that if on another trial the facts should be substantially the same, the prisoner is entitled to have his cause submitted and determined on the question of his guilt or innocence of the crime of manslaughter.

In *S. v. Banks*, 143 N. C., 652-656, speaking of malice as an element of the crime of murder, and of the suggested effect upon it of our statute dividing the crime of murder into two degrees, the Court said:

"There has been no change wrought in this respect by the statute dividing the crime of murder into two degrees (Revisal, sec. 3631), as to the element of malice which must exist to make out the crime.

"Both before and since the statute, murder is the unlawful killing of another with malice aforethought. See Clark's Crim. Law, p. 187. This malice may arise from personal ill-will or grudge, but it may also be said to exist whenever there has been a wrongful and intentional killing of another without lawful excuse or mitigating circumstance. The statute does not undertake to give any new definition of murder, but classifies the different kinds of murder as they existed at common law, and which were, before the statute, all included in one and the same degree.

"Thus, all murder done by means of poison, lying in wait, etc., or by any other kind of willful, deliberate or premeditated killing, or murder done in effort to perpetrate a felony, shall be murder in the first degree and punished with death. All other kinds of murder shall be deemed murder in the second degree, and punished by imprisonment in the State's Prison."

It will thus be seen that the constituent definition of murder remains as it was, and, while malice, in the popular sense of personal hatred or ill-will, is not always required, and may be said to exist whenever there has been an unlawful and intentional homicide without excuse or mitigating circumstance, its presence is always necessary to the crime of murder, whether in the first or the second degree. Manslaughter is the unlawful killing of another without malice, and, under given conditions, this crime may be established, though the killing has been both unlawful and intentional. Thus, if two men fight upon a sudden quarrel and on equal terms, at least at the outset, and in the progress of the fight one kills the other—kills in the anger naturally aroused by the combat—this ordinarily will be but manslaughter. In such case, though the killing may have been both unlawful and intentional, the passion, if aroused by provocation which the law deems adequate, is said to displace malice and is regarded as a mitigating circumstance reducing the degree of the crime.

This position, and the reason upon which it is properly made to rest, is well stated by *Judge Gaston,* delivering the opinion of the Court in *S. v. Hill,* 20 N. C., 491-496, as follows:

"If instantly thereupon (after being previously assaulted), in the transport of passion thus excited, and without previous malice, the prisoner killed the deceased, it would have been a clear case of manslaughter. Not because the law supposes that this passion made him unconscious of what he was about to do, and stripped the act of killing of an intent to commit it, but because it presumes that passion disturbed the sway of reason, and made him regardless of her admonitions. It does not look upon him as temporarily deprived of intellect, and therefore not an accountable agent; but as one in whom the exercise of judgment is impeded by the violence of excitement, and accountable, therefore, as an *infirm* human being. We nowhere find that the passion which in law rebuts the imputation of malice must be so overpowering as for the time to shut out knowledge and destroy volition. All the writers concur in representing this indulgence of the law to be a condescension to the frailty of the human frame, which during the *furor brevis* renders a man deaf to the voice of reason, so that *although*

*the act done was intentional of death,* it was not the result of malignity of heart, but imputable to human infirmity."

Our decisions are also to the effect that though there may have been previous ill-feeling between the parties, yet if they afterwards meet accidentally, and a fight ensues, in which one of them is killed, it shall not be intended that they were moved by the old grudge, "unless it so appear from the circumstances of the affair."

This was directly held in the case of *S. v. Hill, supra,* where there had previously been a fight between the parties. The ruling being expressed as follows: "Where two persons have formerly fought on malice and are apparently reconciled, and fight again on a fresh quarrel, it shall not be intended," etc. The principle was affirmed and again applied in *S. v. Jacob Johnson,* 47 N. C., 247, and in the opinion of this case is put by way of illustration: "But where A. bears malice against B., and they meet by accident, and upon a quarrel B. assaults A. with a grubbing-hoe, and thereupon A. shoots B. with a pistol, the rule of referring the motive to the previous malice will not apply." And this is in accord with the doctrine generally prevailing.

Applying these principles to the facts presented, while the evidence tends to show that there was some animosity between these parties, there was nothing in the conversations between them, according to any version of them, which would indicate a fixed and definite purpose to take the life of the deceased. The expressions imputed to the prisoner seem to have been in reply to a threat or boast by the officer that he could easily effect the arrest of the prisoner, and, according to all the testimony, the meeting in which the killing occurred was entirely accidental, certainly on the part of the prisoner. The witnesses for both the State and the prisoner who saw the occurrence say that the prisoner at the time was apparently leaving the town and going toward his place of work some distance away, when he was hailed by the officer, overtaken, arrested without any warrant or any conduct that presently justified it, turned back and physically shoved along at least twice before he offered any active resistance. If these facts are established, we are of opinion, as stated, that they repel the idea of malice, and the question is presented only on the issue as to manslaughter, and the judge should so have instructed the jury.

Speaking to the question, in *S. v. Miller,* 112 N. C., 885, an authority not inapplicable to the facts presented here, *Avery, J.,* delivering the opinion, said:

"It is true that when the killing with a deadly weapon is

STATE *v.* BALDWIN.

proved and admitted, the burden is shifted upon the prisoner, and he must satisfy the jury, if he can do so from the whole of the testimony, as well that offered for the State as for the defense, that matter relied on to show mitigation or excuse is true. *S. v. Vann,* 82 N. C., 631; *S. v. Willis,* 63 N. C., 26; *S. v. Brittain,* 89 N. C., 481. But when it appears to the judge that in no aspect of the testimony, and under no inference that can be fairly drawn from it, is the prisoner guilty of murder, it is his duty, certainly when requested to do so, to instruct the jury that they must not return a verdict of any higher offense than manslaughter, just as it would be his duty to instruct, in a proper case, that no sufficient evidence had been offered to either excuse or mitigate the slaying with a deadly weapon. Though the law may raise a presumption from a given state of facts, nothing more appearing, it is nevertheless the province of the court, when all the facts are developed and known, to tell the jury whether in every aspect of the testimony the presumption is rebutted. *S. v. Roten,* 86 N. C., 701; *Doggett v. R. R.,* 81 N. C., 459; *Ballinger v. Cureton,* 104 N. C., 474."

Nor do we think that the statement of the prisoner to the witness Shoemaker within five minutes of the occurrence should be allowed to affect the view we take of the case. This witness testified that, going to the place five minutes after the shooting, Henry Coffey said to witness, "Mr. Baldwin has shot Mr. Miller and killed him," and witness said to Mr. Baldwin, "You have about fixed yourself to be hung, haven't you?" and Baldwin replied, "I have done what I intended to do, and I don't care what in the hell they do with me." The question as put by the witness was well calculated to arouse the prisoner, and the conversation at the time and place it occurred, and under the attendant facts, should be regarded, we think, as the not unnatural expression of an angered man who had just passed through a fateful encounter with his fellowman, and should properly be referred to the occurrence itself and not by any fair intendment construed as an expression of a preconceived definite purpose to kill.

In awarding a new trial to the prisoner, with an intimation that his cause should be submitted to the jury on an issue as to manslaughter, we give such intimation only on the assumption that the facts shall be again developed substantially as they now appear, and especially on the theory that the arrest of the prisoner was without a valid warrant or other lawful authority. The court so held in the case, and the presumption is that this ruling was correct. If it should otherwise appear on a second trial, the case would be presented in an entirely different aspect.

Under our authorities, the new trial is at large, and the case will be proceeded with in accordance with law and on the facts as they may be disclosed on a second hearing.

For the error indicated, there must be a new trial, and it is so ordered.

New trial.