STATE OF NORTH CAROLINA v. ALBERT LEE WRENN

No. 27

(Filed 15 December 1971)

1. Criminal Law § 115— submission of lesser degrees

Where, under the bill of indictment, it is permissible to convict defendant of a lesser degree of the crime charged, and there is evidence to support a milder verdict, defendant is entitled to have the different permissible verdicts arising on the evidence presented to the jury under proper instructions.

2. Criminal Law § 115— failure to submit lesser degrees — conviction of crime charged

Erroneous failure to submit the question of defendant's guilt of lesser degrees of the same crime is not cured by a verdict of guilty of the offense charged because, in such case, it cannot be known whether the jury would have convicted of a lesser degree if the different permissible degrees arising on the evidence had been correctly presented in the court's charge.

3. Homicide § 14— intentional shooting which proximately causes death — presumptions

If the State has satisfied the jury beyond a reasonable doubt that defendant intentionally shot his wife with a shotgun and thereby proximately caused her death, the presumptions arise that the killing was (1) unlawful and (2) with malice; and, nothing else appearing, the defendant would be guilty of murder in the second degree.

4. Homicide § 14— assertion that killing was accidental — burden of proof

Defendant's assertion that the killing of his wife with a deadly weapon was accidental is not an affirmative defense which shifts the burden of proof to him to exculpate himself from a charge of murder, but is merely a denial that he has committed the crime, and the burden remains on the State to prove a homicide resulting from the intentional use of a deadly weapon before any presumption arises against defendant.

State v. Wrenn

5. Homicide § 30— failure to submit involuntary manslaughter

In this prosecution of defendant for first degree murder of his wife with a shotgun, the trial court erred in failing to submit involuntary manslaughter as a possible verdict where defendant's evidence was to the effect that he only intended to scare his wife with the shotgun and had no intention of killing her, and that in the scuffle between the parties the shotgun went off accidentally.

6. Homicide § 6— involuntary manslaughter

The crux of the crime of involuntary manslaughter is whether an accused unintentionally killed his victim by a wanton, reckless, culpable use of a firearm or other deadly weapon.

7. Homicide § 23— proximate cause of death — instructions — use of "natural and probable result"

The use of the phrase "natural and probable result" in homicide instructions is disapproved, the crucial question being whether a wound inflicted by an unlawful assault *proximately caused* the death.

Justice SHARP dissenting.

APPEAL by defendant from *Johnston, J.,* 2 December 1970 Session, GUILFORD Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging him with the first degree murder of his wife Mary Etta Wrenn on 25 July 1970.

The State's evidence tends to show that various neighbors of defendant and deceased were in the general vicinity of the Wrenn home at the time of the killing and heard three gunshots at the Wrenn residence. One witness heard a gunshot, saw defendant in the yard struggling with a long object, and then heard two more shots. Shortly thereafter the sheriff's office was advised of the difficulty by telephone, and ten minutes later the defendant himself called the sheriff's office, stating that he had killed his wife and needed help immediately. Officers were dispatched to the scene and found defendant sitting on the front porch unarmed. Mrs. Wrenn's body was lying facedown in the yard near a trailer. Her head, surrounded by a pool of blood, was partially blown away and particles of the brain were scattered around the yard. Defendant was fully advised of his constitutional rights at the scene, placed under arrest, and taken to jail.

The investigating officers entered the home and found the death weapon, a shotgun, leaning against the end of a table. On

the sofa in the living room the officers found a note in defendant's handwriting which stated: "I can't live with a woman that does me like she does so I'll end it all. Please you or all (illegible) to take what I'm going to do so bury us together."

Defendant was again warned of his rights at the jail, stated that he understood them, and freely, knowingly and voluntarily made a statement to the sheriff which was transcribed in the sheriff's own handwriting and signed by defendant after the transcription had been read to him. That statement reads as follows: "I ran her off yesterday and she went to her daughter's, Shirley Engle's, living in a trailer on Summit Avenue. Friday night I went over to Shirley's and brought the children home. When I put them to bed, I started drinking. I went back to Shirley's trailer and she drove her car home, and I followed her. I made her go to bed and I had another drink or two and went to bed. When I woke up about noon, she was gone. About an hour after I got up, she drove in with the kids. I shot at her when she started in the house while I was writing the note on the sofa, and she ran around the house toward the garden, and I ran out the front door behind her and got around in front of her and shot her. The gun had halfway jammed and I had to get the empty out. When I got around in the yard, she was squatted down behind a trailer and we had a scuffle and she was laying on the ground grabbing at my gun when I shot her. I make this statement freely and voluntarily and have been advised of my rights."

The State's evidence further tends to show that when the jailer asked defendant which funeral home he wanted to take care of the body he said, "I don't give a damn. Let the family take care of it."

Defendant testified in his own behalf and offered other witnesses whose testimony tends to depict the background of the tragedy.

Ronald Lee Wrenn, twenty-year-old son of defendant and deceased, testified that his mother had been keeping company for two months with a man named Bob Dalton; that his father and mother had a big argument on Friday night before his mother was killed on Saturday; that his father stated on Friday night that he had found out about Bob Dalton and had told his mother to leave.

---

**State v. Wrenn**

---

Arnold Wrenn, twelve-year-old son of defendant and deceased, testified that his mother was keeping company with Bob Dalton, and he had accompanied them when they would go out to eat and to other places. Bob Dalton would come to their home when his father was absent and ask the children to go to another room or "to the store or something." He told his father about the situation on the day before his mother was killed. He and his mother came home on Saturday morning, walked in the house, and saw his father in the hallway. Nothing was said. His mother ran out of the house and was about halfway around the house when the first shot, which hit the truck, was fired. His father went around the house and he ran into his brother's room, and when he looked out the window his mother had hold of the end of the gun barrel and they were struggling with the gun. "She kind of fell and was kicking his hands and his chest and made the gun go off and it hit her in the head." He and his sister then went to the front door and his father told them to leave. On Friday, the day before his mother was killed, he heard his father tell her, "Woman, you'd better not be here when I get back or you're going to be a dead woman"; and on Saturday, just before his mother was killed, he heard his father say he "ought to just kill her there or words to that effect."

Albert Lee Wrenn, testifying in his own behalf, said that about six o'clock one morning he received a phone call from Bob Dalton's wife in which she stated that Mrs. Wrenn was running around with her husband; that he didn't believe it and went to where his wife worked and asked her about it. His wife stated there was nothing to it and he forgot about it. On Tuesday night before the killing on Saturday, Bob Dalton's wife telephoned again and said Mrs. Wrenn had bought Mr. Dalton a shirt and had placed a note in the pocket stating that she was in love with him. Mrs. Wrenn walked into the room while that conversation was taking place and again denied the accusation. On Friday morning his son Arnold told him that his mother had been going with Bob Dalton and that they had been over to Shirley Engle's the night before. He went to his daughter's home, and she verified what Arnold had told him. He returned home and again confronted his wife with the accusations, to which she replied, "If you hadn't been so damned stupid, you'd have realized it the first time that woman called you." He then told her to be gone when he got home from work that night. When he came home from work Friday night, his wife and children were gone. He

realized he couldn't afford a baby-sitter and decided that he would make his wife come back home, quit her job, and take care of the children. He went to the home of his daughter, Shirley, got his wife and children, took them home, and put the children to bed. He drank half a fifth of Old Grandad whiskey and went to bed, telling his wife to sleep with the children. When he arose on Saturday morning his wife and children were gone, and he then decided it was necessary to scare her in order to bring about a change in her conduct. He wrote the note offered in evidence by the State, and shortly thereafter his wife drove into the yard with the two youngest children, Diane and Arnold. She entered the house, and he asked her where she had been. She replied "none of your damn business," and he said "I'm going to make it some of mine," and reached for the shotgun. She went out the front door and, after she jumped off the porch, he fired the gun "straight out the door," striking the truck. He then walked out the door and around the corner of the house where he saw his wife duck her head behind the trailer. He again fired the gun over her head, the load striking the house. He walked to the back of the trailer where she was squatting and she began cursing him, whereupon he shook his finger at her and said, "Tell me why in the world I shouldn't just kill you laying right there?" She grabbed the end of the shotgun with her left hand, pulled it up to her head, then placed her other hand on the gun and started kicking, breaking his little finger in two places. While trying to pull the gun away, it went off and she was killed. The only intention he had was to scare his wife and "make her do better." He wrote the note intending that his wife should find it. He was very intoxicated at the time but was not so drunk on this occasion that he didn't know what he was doing.

The court limited the jury in its deliberations to one of three verdicts, to wit: Murder in the first degree (with or without recommendation as to punishment), murder in the second degree, or not guilty. Defendant was convicted of murder in the second degree and sentenced to a term of twenty-five years in prison. He appealed to the Court of Appeals, and the case was transferred to the Supreme Court for initial review pursuant to the Court's general order dated 31 July 1970. Errors assigned will be noted in the opinion.

*Wallace C. Harrelson, Public Defender, Eighteenth Judicial District, for defendant appellant.*

*Robert Morgan, Attorney General; Sidney S. Eagles, Jr., Assistant Attorney General; Russell G. Walker, Jr., Staff Attorney, for the State of North Carolina.*

HUSKINS, Justice.

Defendant assigns as error the failure of the trial court to submit manslaughter as a permissible verdict.

[1, 2] Where, under the bill of indictment, it is permissible to convict defendant of a lesser degree of the crime charged, and there is evidence to support a milder verdict, defendant is entitled to have the different permissible verdicts arising on the evidence presented to the jury under proper instructions. *State v. Keaton,* 206 N.C. 682, 175 S.E. 296 (1934); *State v. Riera,* 276 N.C. 361, 172 S.E. 2d 535 (1970). Erroneous failure to submit the question of defendant's guilt of lesser degrees of the same crime is not cured by a verdict of guilty of the offense charged because, in such case, it cannot be known whether the jury would have convicted of a lesser degree if the different permissible degrees arising on the evidence had been correctly presented in the court's charge. *State v. Davis,* 242 N.C. 476, 87 S.E. 2d 906 (1955). This principle applies, however, only in those cases where there is evidence of guilt of the lesser degree. *State v. Smith,* 201 N.C. 494, 160 S.E. 577 (1931). If all the evidence tends to show that the crime charged in the indictment was committed, and there is no evidence tending to show commission of a crime of less degree, the principle does not apply and the court correctly refuses to charge on the *unsupported lesser degree. State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393 (1971), and cases cited. See *State v. Freeman,* 275 N.C. 662, 170 S.E. 2d 461 (1969), for discussion of the law in this and other jurisdictions when there *is* evidence sufficient to require submission of manslaughter but the jury convicts of murder in the first degree.

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. G.S. 14-17; *State v. Lamm,* 232 N.C. 402, 61 S.E. 2d 188 (1950). Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation.

*State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889 (1963). Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *State v. Benge,* 272 N.C. 261, 158 S.E. 2d 70 (1967). Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, *and without intention to kill or inflict serious bodily injury. State v. Foust, supra; State v. Honeycutt,* 250 N.C. 229, 108 S.E. 2d 485 (1959); *State v. Satterfield,* 198 N.C. 682, 153 S.E. 155 (1930).

[3] If the State has satisfied the jury beyond a reasonable doubt that defendant *intentionally* shot his wife with a shotgun and thereby proximately caused her death, "two presumptions arise: (1) that the killing was unlawful, and (2) that it was done with malice; and, *nothing else appearing,* the defendant would be guilty of murder in the second degree." *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969); *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560 (1968). Justice Bobbitt (now Chief Justice) accurately analyzed these principles in *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322 (1955), as follows:

> "When the killing with a deadly weapon is admitted or established, two presumptions arise: (1) that the killing was unlawful; (2) that it was done with malice; and an unlawful killing with malice is murder in the second degree. In *State v. Gregory,* 203 N.C. 528, 166 S.E. 387 [1932], where the defense was that an *accidental* discharge of the shotgun caused the death of the deceased, it was stated that the presumptions arise only when there is an *intentional killing* with a deadly weapon; and since the *Gregory case* it has been often stated that these presumptions arise only when there is an intentional killing with a deadly weapon. But the expression, *intentional killing,* is not used in the sense that a specific intent to kill must be admitted or established. The sense of the expression is that the presumptions arise when the defendant *intentionally assaults* another with a deadly weapon and thereby proximately causes the death of the person assaulted. [Citations omitted.] A specific intent *to kill,* while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of second degree murder or manslaughter. The intentional use of a deadly weapon as a weapon, when death proximately results from such use,

gives rise to the presumptions. . . . The presumptions do not arise if an instrument, which is *per se* or may be a deadly weapon, is not intentionally used as a weapon, *e.g.*, from an accidental discharge of a shotgun."

[4]   Here, the presumptions arise if the jury finds, under proper instructions, that defendant *intentionally* shot his wife and thereby caused her death. Conversely, they do not arise if the jury finds the shotgun accidentally discharged, resulting in her death. Defendant's assertion that the killing of his wife with a deadly weapon was accidental is not an affirmative defense which shifts the burden of proof to him to exculpate himself from a charge of murder. On the contrary, it is merely a denial that the defendant has committed the crime, and the burden remains on the State to prove a homicide resulting from the intentional use of a deadly weapon before any presumption arises against the defendant. *State v. Phillips*, 264 N.C. 508, 142 S.E. 2d 337 (1965). *Accord, State v. Williams*, 235 N.C. 752, 71 S.E. 2d 138 (1952).

[5, 6]   Although the State's evidence tends to show an intentional killing with malice and with premeditation and deliberation, defendant's evidence is to the effect that he only intended to scare his wife and had no intention of killing her; that in the scuffle between the parties the shotgun went off accidentally. In this setting, and with credibility a matter for the jury, the court should have submitted involuntary manslaughter with appropriate instructions. "It seems that, with few exceptions, it may be said that every unintentional killing of a human being proximately caused by a wanton or reckless use of firearms, in the absence of intent to discharge the weapon, or in the belief that it is not loaded, and under circumstances not evidencing a heart devoid of a sense of social duty, is involuntary manslaughter." *State v. Foust, supra* (258 N.C. 453, 128 S.E. 2d 889). As it relates to involuntary manslaughter, intent is not an issue. The crux of that crime is whether an accused unintentionally killed his victim by a wanton, reckless, culpable use of a firearm or other deadly weapon. *State v. Phillips, supra* (264 N.C. 508, 142 S.E. 2d 337). *Accord, State v. Brooks*, 260 N.C. 186, 132 S.E. 2d 354 (1963); *State v. Griffin*, 273 N.C. 333, 159 S.E. 2d 889 (1968).

Since the evidence offered by defendant, if believed by the jury, is sufficient to support a verdict of involuntary manslaugh-

ter, which is a lesser degree of the crime charged in the bill of indictment, the court erred in excluding it from the list of permissible verdicts. This error entitles defendant to a new trial.

[7] Discussion of the remaining assignments of error is deemed unnecessary. However, it is not amiss to call attention to the fact that the use of the phrase "natural and probable result" in homicide charges has been expressly disapproved. "The crucial question is whether a wound inflicted by an unlawful assault *proximately caused* the death—not whether death was a natural and probable result of such a wound and should have been foreseen. Foreseeability is not an element of proximate cause in a homicide case where an intentionally inflicted wound caused the victim's death." *State v. Woods,* 278 N.C. 210, 219, 179 S.E. 2d 358, 363 (1971).

New trial.

Justice SHARP dissenting.

As stated in the majority opinion, while defendant was convicted of second-degree murder, the State's evidence makes out a case of murder in the first degree. Concededly, if there is any evidence which tends to reduce the crime to manslaughter, defendant is entitled to have this issue submitted to the jury upon a proper charge. *State v. Merrick,* 171 N.C. 788, 88 S.E. 501.

Defendant's version of the homicide and the events preceding it, except when quoted, are summarized as follows:

The deceased, defendant's wife and the mother of his five children, had been carrying on an illicit love affair with one Bob Dalton. On the afternoon before her death defendant accused her of it, and she taunted him with his stupidity for not having discovered it earlier. He ordered her to leave in these words: "Woman, you'd better not be here when I get back or you're going to be a dead woman." At the time he said it, however, he did not mean it.

Deceased went to the home of her married daughter, taking with her the two youngest children, Diane and Arnold. That evening defendant brought the children home. Later that night he decided he could not afford a baby sitter and he would make his wife give up her job, stay at home, and care for the children. He returned to his daughter's and made his wife come

back. He told her he "wasn't sleeping with her any more," and made her get in bed with the little girl. When he awakened the next morning his wife was gone.

After two drinks he decided that the only thing he could do about the situation was to give his wife "a good scaring." Thereupon he wrote the following note: "I can't live with a woman that does me like she does so I'll end it all. Please you or all (the next word is illegible) to take what I'm going to do so bury us together." Defendant placed this note on the couch, got his shotgun, and put four shells in it.

Defendant was sitting on the couch with the gun beside him when his wife, preceded by Diane and Arnold, came in the front door about thirty minutes later. Defendant asked her where she had been. She replied that it was none of his damn business. He said he was going to make it some of his business and reached back for the shotgun. She ran out of the front door and jumped off the porch. With the intention of scaring her he fired straight out the door by which she had left. The shot hit his truck. She ran around the corner of the house to hide behind a trailer. When she raised her head he pointed the shotgun at her. She ducked; he threw up the gun and fired. This shot hit the side of the house. He then walked around to the back of the trailer "where she was squatting down." She "let into cussing" him. He pushed her over, shook his finger at her and said, "Tell me why in the world I shouldn't just kill you laying right there?" Defendant's version of what happened after he said that is quoted verbatim as follows:

"She reached with her left hand and got the end of my shotgun and pulled it up to her head like that, and got it with the other hand like that, and that's when she started kicking at me. I was trying to pull it away from her and that's when it went off. . . . The only intention I had was to scare my wife and make her do better. . . . When I shot her in the head, she was lying on the right side with her two hands on the end of the gun barrel. . . .

"I wasn't so drunk I didn't know what I was doing. I knew what I was doing. . . .

"That's what I've told; that I wrote this note and armed myself with the shotgun and went out to where my wife was

and I'm telling this jury that she brought it all on herself and she is the one that put the gun up to her head. I had the gun in my hand at the time it went off.

"I don't think I had my hand on the trigger when it fired and blew her head off. I had my right hand like this, and I said, 'Tell me why I shouldn't kill you right here,' and that's when she grabbed that gun and started kicking. I grabbed back with the gun to pull it away. She did have both hands on the barrel. She did not have her hands on the trigger at all. I don't remember having my hand on the trigger when it fired and killed her. I was trying to get the gun away from her."

At the time of the shooting defendant's twelve-year-old son, Arnold, and his little girl, Diane, were at the house witnessing these events.

The majority decision is that the foregoing testimony, if the jury should believe it, would support a verdict of involuntary manslaughter and that defendant is entitled to a new trial because the judge excluded it from the list of permissible verdicts. In my view, evidence of manslaughter is lacking, and defendant is guilty of murder in the second degree upon his own statement.

The distinction between murder in the second degree and manslaughter is the presence or absence of malice, express or implied. Murder in the second degree is the unlawful killing of another with malice but without premeditation and deliberation. Manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *State v. Downey*, 253 N.C. 348, 353, 117 S.E. 2d 39, 43.

Malice has many definitions. To the layman it means hatred, ill will or malevolence toward a particular individual. To be sure, a person in such a state of mind or harboring such emotions has actual or particular malice. *State v. Benson*, 183 N.C. 795, 111 S.E. 869. In a legal sense, however, malice is not restricted to spite or enmity toward a particular person. It also denotes a wrongful act intentionally done without just cause or excuse; "whatever is done 'with a willful disregard of the rights of others, whether it be to compass some unlawful end, or some lawful end by unlawful means constitutes legal malice.'" *State v. Knotts*, 168 N.C. 173, 182-3, 83 S.E. 972, 976. It comprehends

not only particular animosity "but also wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person." 21 A. & E. 133 (2d Edition 1902). *Accord, State v. Long,* 117 N.C. 791, 798-9, 23 S.E. 431.

This Court has said that "[m]alice does not necessarily mean an actual intent to take human life; it may be inferential or implied, instead of positive, as when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life." *State v. Trott,* 190 N.C. 674, 679, 130 S.E. 627, 629; *State v. Lilliston,* 141 N.C. 857, 859, 54 S.E. 427. In such a situation "the law regards the circumstances of the act as so harmful that the law punishes the act as though malice did in fact exist." 1 Wharton, Criminal Law and Procedure § 245 (Anderson, 1957).

Manslaughter is of two types—voluntary and involuntary. Instances of voluntary manslaughter are (1) a killing by reason of anger suddenly aroused by provocation which the law deems adequate to dethrone reason temporarily and thus to displace malice; and (2) a killing resulting from the use of excessive force in the exercise of the right of self-defense. *State v. Woods,* 278 N.C. 210, 179 S.E. 2d 358; *State v. Marshall,* 208 N.C. 127, 179 S.E. 427; *State v. Merrick, supra; State v. Baldwin,* 152 N.C. 822, 68 S.E. 148. Thus "under given conditions, this crime may be established, though the killing has been both unlawful and intentional." *State v. Baldwin, supra* at 829, 68 S.E. at 151.

Clearly the evidence in this case does not justify a charge upon *voluntary* manslaughter. Defendant makes no contention that he shot his wife in the heat of passion or in self-defense. By his testimony the discharge of the gun was not intentional.

Involuntary manslaughter is the unintentional killing of a human being without either express or implied malice (1) by some unlawful act not amounting to a felony *or naturally dangerous to human life,* or (2) by an act or omission constituting culpable negligence. *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889; *State v. Honeycutt,* 250 N.C. 229, 108 S.E. 2d 485; *State v. Satterfield,* 198 N.C. 682, 153 S.E. 155. In *Foust,* it is said that ordinarily an unintentional homicide resulting from the reckless use of firearms "in the absence of intent to discharge the weapon,

or in the belief that it is not loaded, *and* under circumstances *not evidencing a heart devoid of a sense of social duty,* is involuntary manslaughter." *Id.* at 459, 128 S.E. 2d at 893. (Emphasis added.) When the circumstances do show a heart devoid of a sense of social duty, the homicide cannot be involuntary manslaughter.

Defendant's appeal, and the majority decision that he is entitled to have the issue of involuntary manslaughter submitted to the jury, are based upon defendant's testimony. He asserts that he did not intend to shoot his wife; that his sole purpose was to give her "a good scaring." Conceding the truth of defendant's testimony that he did not intentionally fire the gun, still his admitted conduct was so wanton and reckless of consequences, and so naturally dangerous to human life, that the law will imply malice from it. In determining the degree of homicide, the events immediately preceding the killing may not be disassociated from the actual shooting.

First, defendant shot straight out the door through which his wife had fled when she saw him reach for the gun. Then he pursued her and, discovering her behind a trailer, he pointed the gun at her, a violation of G.S. 14-34. When she ducked he threw up the gun and fired a second shot, after which he went to where she was "squatting" and pushed her to the ground. Standing over her, gun in hand, he inquired why he shouldn't kill her "laying right there." And "that's when she grabbed the gun and started kicking."

Surely she had every reason to believe that defendant intended to kill her. He should have expected her to grab the barrel of the gun in an attempt to divert it, the only defensive move she could have made as she lay on the ground at his feet. Certainly he should have known that the gun was likely to discharge in any such struggle for its possession.

It would defy not only the legal definitions but also common sense for the law to allow defendant, under the circumstances here disclosed, to say that, because the gun fired while he was trying to get it away from the woman he had threatened to kill and who obviously thought he meant to kill her, the shooting was unintentional and his conduct not malicious. His own statement precludes any disclaimer of malice and convicts him of murder in the second degree.

One who is an aggressor, or who enters a fight voluntarily without lawful excuse, may not plead self-defense when he slays his adversary. *State v. Randolph,* 228 N.C. 228, 45 S.E. 2d 132. Similarly, one who engages in a struggle over a gun with another, whom he has threatened to kill with it, should not be heard to say that the killing was unintentional when the gun is discharged in the fracas.

Defendant's acts, naturally dangerous to human life and evidencing a callous recklessness, establish malice as a matter of law, in my view. That he would do such deeds in the presence of his two young children is a further manifestation of a "heart devoid of a sense of social duty." My vote is to uphold the trial below.