## STATE v. HORACE BARBER.

(Filed 3 May, 1967.)

**1. Criminal Law § 71—**

Evidence tending to show that defendant, while at the police station being booked for homicide during the change of shifts while officers of his acquaintance were entering, leaving and standing in the lobby of the station, volunteered to several of the officers, without any questioning whatsoever, statements to the effect that he shot a named person and hoped that his victim died, *held* to support findings of the court upon the *voir dire* that the statements were freely and voluntarily made, and the admission of the statements in evidence was not error.

**2. Criminal Law § 107—**

The charge of the court in this case is held to declare and explain the law arising on the evidence as required by G.S. 1-180, and not to contain prejudicial error.

**3. Criminal Law § 159—**

Exceptions not brought forward in the brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

APPEAL by defendant from *Hall, J.,* at the 12 September 1966 Session of LEE.

By an indictment, proper in form, the defendant was charged with the murder of Leroy Tally on 16 March 1966. Through his court appointed counsel he entered a plea of not guilty. He was found guilty of second degree murder and was sentenced to confinement in the State's prison for a term of not less than 22 nor more than 27 years. His contentions at the trial were that he did not intend to kill the deceased and that he shot in self-defense. Upon appeal, he contended in his brief and oral argument that the court

erred in admitting testimony of police officers concerning statements made by him following his arrest, and erred by failing in its charge to the jury to declare and explain the law arising upon the evidence.

The State's evidence, apart from testimony of police officers concerning statements made to them by the defendant, was to the following effect:

At approximately 11 p.m. on 16 March 1966, this being shift changing time at the mill of the Federal Spinning Corporation, the defendant, who was not employed at the mill, was in its office building in the company of Mrs. Tally, who was employed there, she then being engaged in a telephone conversation. They went out and, a few minutes later, she ran back into the office and telephoned the police. The defendant also came back into the office carrying a shotgun and, upon inquiry by an employee of the mill, replied, "I've done killed one s. o. b."

Police officers, arriving shortly thereafter in response to the call, found in the well-lighted parking lot of the mill the automobile of the deceased, parked near that of Mrs. Tally. The deceased was behind the steering wheel of his car, the left door being open and his foot being on the ground. He was bleeding profusely from the face. He died almost immediately, the cause of death being a pistol bullet wound entering the eye and continuing through the brain. Five bullet holes were found in the car in addition to the wound in the head of the deceased. Following a conversation with the defendant, the officers found upon the roof of the mill building a pistol, registered in the name of the defendant the preceding day, in which were six empty cartridges. This pistol had been in the defendant's possession the afternoon prior to the shooting of the deceased. When registering the pistol on the morning before the shooting, the defendant was told by a police officer that Tally had threatened to kill the defendant if the defendant did not leave his wife alone. The first police officer to reach the mill found the defendant walking from the office toward the parking lot and carrying a shotgun, which he dropped to the ground on the officer's command to do so. He was placed under arrest, handcuffed, put in a police car and carried to the police station.

Several police officers testified to statements made by the defendant. Prior to any testimony by the officers concerning these statements, the presiding judge sent the jury from the courtroom and heard testimony of the officers to the following effect:

Officer Rouse, who reached the scene first, had been informed by police radio that the defendant had shot someone at the mill and was armed. Upon arrival there he saw the defendant carrying a

shotgun and ordered him to drop it, which he did. He then asked the defendant, "Horace, what happened here?" The defendant replied that he had just shot Leroy Tally. Thereupon, Officer Rouse put handcuffs on the defendant, told him he was under arrest and instructed Officer Wicker, who had driven up, to keep the defendant in his police car. Officer Rouse then went over to the Tally automobile and observed the condition of the deceased and the automobile. He returned to the police car and asked the defendant where was the "other weapon that was used." He then told the defendant that he did not have to tell the police anything if he did not want to, that anything he said could be used for or against him in court and that he was entitled to counsel. He did not tell the defendant that if he was unable to employ counsel the State would furnish a lawyer to him. The defendant then told Officer Rouse where the "other weapon" was, this being the place where the pistol was found on the roof of the mill. No other question was asked the defendant at the scene of the shooting by anyone and no other warning as to his rights was given him prior to his statements to the police officers set forth below. No statement made by the defendant at the scene of the shooting was admitted in evidence.

Officer Wicker heard the above conversation between Officer Rouse and the defendant. Officer Wicker asked the defendant no questions. Officer Wicker did not testify in the presence of the jury concerning any statement made by the defendant. No one else was in the car with them at the scene of the shooting.

The defendant was driven to the police station by Sergeant McDougald. No one else was with them. Sergeant McDougald did not ask any questions of the defendant or make any statement en route to the police station. The defendant, while so in the police car, made the statement set forth below. On arrival at the station, Sergeant McDougald told the defendant he did not have to make any statement and he was entitled to an attorney, but he did not ask the defendant any questions. The defendant said he did not want an attorney.

Sergeant McDougald and the defendant reached the police station at the time for changing shifts. Consequently, several police officers were entering, leaving and standing in the lobby of the station. Sergeant McDougald stayed there with the defendant. Police Dispatcher Hooker was on duty. When the defendant was brought to the station, neither Dispatcher Hooker nor Sergeant McDougald asked him any questions or made any statement to him. In the presence of Dispatcher Hooker, the defendant three different times made the statement set forth below.

Radio Dispatcher Little was also present at the station when Sergeant McDougald brought in the defendant. Without any question by Dispatcher Little or anyone else, he heard the defendant make the statement set forth below.

Officer Nathan Johnson, coming on duty and knowing nothing of the shooting, entered the front door and immediately saw the defendant who, without any preliminary statement or question, greeted Officer Johnson with the statement set forth below.

Captain Mason was the officer in charge at the station when Sergeant McDougald brought the defendant in. He spoke to the defendant and without any question or statement by anyone, the defendant made to Captain Mason the statement set forth below.

At the police station the defendant was told that he could telephone anyone he liked. He requested the officers to send for his brother. They dispatched a police car to pick up the brother and brought him to the police station, where he conferred with the defendant, this being after making the statements in question.

The defendant did not contradict any of the above testimony nor did he deny making any of the statements attributed to him by the officers or contend that any officer mistreated him or coerced him into making any statement.

The trial judge excluded proposed testimony by Officer Rouse concerning statements made to him by the defendant at the scene of the shooting on the ground that the warning given by Officer Rouse did not meet all of the requirements therefor. He found that the statements made by the defendant in the presence of Sergeant McDougald, Officer Johnson, Dispatchers Hooker and Little, and Captain Mason were made voluntarily and allowed these officers to testify to such statements. Their testimony in the presence of the jury was as follows:

Sergeant McDougald heard the defendant say, while in the police car en route to the police station, "I shot him and I hope he dies." At the police station, he heard the defendant say three times, "I shot Leroy Tally and I hope he dies."

Dispatcher Hooker heard the defendant state three times, "I shot him and I hope the s. o. b. dies."

Dispatcher Little heard the defendant say, "I hope that s. o. b. breathes his last breath."

Officer Johnson was greeted at the station by the defendant with the statement, "Nathan, I just shot Leroy Tally and I hope the s. o. b. dies."

In response to Captain Mason's greeting, the defendant replied,

"I shot Leroy Tally and I hope the s. o. b. never breathes another breath."

The defendant testified in his own behalf and offered other witnesses. The gist of his testimony and theirs was that for more than four years he and the wife of the deceased had been carrying on, more or less flagrantly, an affair involving frequent acts of adultery and travels together. On several occasions the deceased·had threatened to kill him and on one occasion had chased him with a shotgun. Two days before the shooting the defendant purchased a pistol and had it registered. On the occasion of the shooting he was at the mill waiting for Mrs. Tally pursuant to an earlier conversation with her. When she came out of the mill, they got in her car but the keys were missing. They went into the mill office and she telephoned for the keys. Thereupon, they went back out and sat in her car. The deceased then drove up and stopped. The door of his car opened and the defendant saw him getting out and a shotgun being raised over the steering wheel. The defendant got out of Mrs. Tally's car, ran to the front of it and started shooting at the deceased. He did not intend to kill the deceased but to scare him to keep the deceased from shooting him. After the deceased was shot and sat back in his car, the defendant crept up to it and took the shotgun. The defendant then went toward the mill building, threw his pistol up on the roof, went into the office and asked someone to call the police and an ambulance. Thereupon, he left the office, in response to the request of the employee in charge, and remained in the parking lot until Officer Rouse arrived. He told Officer Rouse he had shot Leroy Tally. He went to school with Officer Johnson and recalls telling him, at the police station, that he had shot Leroy Tally but does not recall saying that he hoped "the s. o. b. breathes his last breath." He does not remember what he said.

*Attorney General Bruton and Assistant Attorney General Rich for the State.*

*H. M. Jackson and J. C. Pittman for defendant appellant.*

LAKE, J. In *State v. Gordon*, 241 N.C. 356, 85 S.E. 2d 322, Bobbitt, J., speaking for the Court, said:

> "When the killing with a deadly weapon is admitted or established, two presumptions arise: (1) that the killing was unlawful; (2) that it was done with malice; and an unlawful killing with malice is murder in the second degree. In *S. v. Gregory*, 203 N.C. 528, 166 S.E. 387, where the defense was that an

*accidental* discharge of the shotgun caused the death of the deceased, it was stated that the presumptions arise only where there is an *intentional* killing with a deadly weapon; and since the *Gregory* case it has been often stated that these presumptions arise only when there is an intentional killing with a deadly weapon. But the expression, *intentional killing,* is not used in the sense that a specific intent *to kill* must be admitted or established. The sense of the expression is that the presumptions arise when the defendant *intentionally assaults* another with a deadly weapon and thereby proximately causes the death of the person assaulted. [Citations omitted.] A specific intent *to kill,* while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of second degree murder or manslaughter. The intentional use of a deadly weapon as a weapon, when death proximately results from such use, gives rise to the presumptions."

There was no error in the admission of the testimony of the several police officers concerning statements made in their presence by the defendant. The statements were obviously material both upon the question of the identity of the killer and upon the question of his intent. They were highly prejudicial to the defendant, but, as we said in *State v. Gray,* 268 N.C. 69, 78, 150 S.E. 2d 1, the mere fact that a self-incriminating statement was made while the defendant was in the custody of police officers, after his arrest by them upon the charge in question and before the employment of counsel to represent him, does not, of itself, render it incompetent. The test of admissibility is whether the statement was in fact made voluntarily.

When it became apparent that the State was about to offer in evidence statements made by the defendant to the police officers, the learned trial judge, following the procedure approved by us in *State v. Gray, supra,* excused the jury from the courtroom and inquired fully into the circumstances under which the proposed statements were made. The defendant did not deny the statements or offer any testimony whatever to show that they were not made voluntarily.

The judge excluded all evidence relating to statements made in response to the two questions by Officer Rouse at the scene of the shooting. Although this officer's opening remark upon arrival at the scene, "Horace, what happened here?", is a far cry from the mental or physical torture intended to wring a confession from an innocent person, which the constitutional protections against self-incrimination were designed to prevent, and though the defendant was not

technically under arrest when he replied, his statement in response to that question was excluded by the trial judge because the warning prescribed in *Miranda v. Arizona*, 384 U.S. 436, 85 S. Ct. 1602, 16 L. Ed. 2d 694, had not been given in its entirety. The trial judge likewise excluded the defendant's response to the question by Officer Rouse concerning the location of "the other weapon" for the reason that the warning given by the officer to the defendant did not comply with the formula prescribed in the *Miranda* case in its entirety. The correctness of these rulings is not before us on this appeal and we express no opinion thereon. They indicate the care with which the trial judge ruled upon the admissibility of statements made by the defendant to police officers.

On the other hand, the trial court found as a fact that the statements to which the other police officers were allowed to testify were made "freely and voluntarily." This finding, being supported by the evidence, is conclusive. *State v. Gray, supra.* The testimony of the officers recounting these statements by the defendant was therefore competent. This is not a case of a friendless transient locked in unfamiliar surroundings, deep in some secret recess of the police headquarters, alone except for armed strangers interrogating him unmercifully. This occurred in a relatively small North Carolina city where the defendant had lived for years and had a first-name acquaintance with several, if not all, of the officers to whom he talked without even waiting for them to question him.

We have carefully examined the charge of the trial judge to the jury in the light of the contention by the defendant that it fails to declare and explain the law arising on the evidence as is required by G.S. 1-180. The defendant has pointed out no error in any instruction relating to the law or called to our attention any applicable principle of law not fully covered by the court's instructions. He has directed us to no misstatement or omission in the court's review of the evidence. We find no error in the charge and no merit in this assignment of error.

Other exceptions in the record are deemed abandoned, these not having been brought forward in the appellant's brief and no argument being stated or authority cited therein with reference thereto. Rule 28, Rules of Practice in the Supreme Court.

No error.