STATE OF NORTH CAROLINA v. LEO DUBOISE

No. 4

(Filed 10 June 1971)

1. Criminal Law § 115— instructions on lesser degrees of crime charged

Where it is permissible under the bill of indictment to convict defendant of a lesser degree of the crime charged, and there is evidence to support a milder verdict, defendant is entitled to have the different permissible verdicts arising on the evidence presented to the jury under proper instructions.

2. Criminal Law §§ 115, 172— error in failure to submit lesser degrees — verdict of guilty

Error in failing to submit the question of defendant's guilt of lesser degrees of the same crime is not cured by a verdict of guilty of the offense charged.

3. Criminal Law § 115— failure to instruct on unsupported lesser degree

Where all the evidence tends to show that the crime charged in the indictment was committed, and there is no evidence tending to show commission of a crime of less degree, the court correctly refuses to charge on the unsupported lesser degree.

4. Homicide § 6— manslaughter defined

Manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation.

5. Homicide § 5— second degree murder defined

Murder in the second degree is the unlawfull killing of a human being with malice but without premeditation and deliberation.

6. Homicide § 4— first degree murder defined

Murder in the first degree is the unlawfull killing of a human being with malice and with premeditation.

**7. Homicide § 14— intentional use of deadly weapon causing death —
presumptions**

**8. Homicide § 30— failure to instruct on manslaughter**

In this first degree murder prosecution, the trial court did not err
in failing to instruct the jury on the issue of manslaughter where all
the evidence tended to show that, without the slightest provocation, de-
fendant over a period of hours assaulted a helpless victim time after
time with various deadly weapons and thereby caused the victim's
death, since the evidence affords no basis upon which defendant
could be found guilty of manslaughter.

**9. Homicide § 14— burden of proving justification or mitigation**

Where presumptions arose upon the State's evidence that a killing
was unlawful and done with malice, it was incumbent upon defendant
to satisfy the jury of the truth of facts which would mitigate the
killing to manslaughter or excuse it altogether.

**10. Homicide § 18— premeditation and deliberation**

Premeditation and deliberation necessary in first degree murder
may be inferred from the vicious and brutal circumstances of the homi-
cide, e.g., lack of provocation, threats before and during the occurrence,
infliction of lethal blows after the victim had been felled and rendered
helpless, and conduct of the defendant before and after the killing.

**11. Homicide § 18— killing by torture — premeditation and deliberation**

When a homicide is perpetrated by means of torture, premedita-
tion and deliberation are presumed and defendant is guilty of murder
in the first degree. G.S. 14-17.

**12. Homicide § 30; Criminal Law § 115— instruction that manslaughter
does not arise on evidence — expression of opinion**

It is not an expression of opinion, but rather the duty of the trial
judge, where the evidence so warrants, to inform the jury that man-
slaughter does not arise on the evidence in the case.

**13. Criminal Law § 84; Searches and Seizures § 1— unreasonable searches
and seizures — articles in plain view**

The constitutional guaranty against unreasonable searches and
seizures applies only in those instances where the seizure is assisted by
a necessary search and does not prohibit a seizure without a warrant
where the contraband is fully disclosed and open to the eye and hand.

State v. Duboise

**14. Criminal Law §§ 77, 169— erroneous admission of evidence favorable to defendant**

Defendant cannot complain of the admission of testimony by police officers as to various self-serving declarations made by defendant to the officers, all of which tended to exonerate him, and which were incompetent, even for corroborative purposes, since defendant did not take the stand, the admission of such testimony being favorable to defendant.

APPEAL by defendant from *McKinnon, J.,* May 1962 Criminal Term COLUMBUS Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging him with the first degree murder of David Preston Williams in Columbus County on 8 December 1961.

The jury returned a verdict of guilty and recommended life imprisonment. Judgment was pronounced accordingly and defendant gave notice of appeal to the Supreme Court. Thereafter, allegedly with defendant's knowledge, consent and approval, the appeal was withdrawn by his court-appointed counsel, John A. Dwyer and Richard E. Weaver of the Columbus County Bar. Defendant was committed to prison and is now serving the sentence imposed.

After six petitions to the United States District Court for writ of *habeas corpus* were denied by Butler, District Judge, the Fourth Circuit Court of Appeals vacated the sixth order dismissing the petition and remanded the case to Judge Butler for consideration of three allegations made by petitioner. (See *Duboise v. Mahoney,* No. 13287, Memorandum Decision, 4th Cir., April 28, 1969). These allegations were: (1) That evidence introduced at his trial was obtained as a result of an unlawful search and seizure; (2) that a statement improperly extracted from him was introduced into evidence at his trial; and (3) that his direct appeal was withdrawn without his knowledge or consent.

Pursuant to the mandate of the Fourth Circuit, Judge Butler conducted an evidentiary hearing on 5 March 1970 to consider the three allegations. Following the hearing, Judge Butler concluded that defendant's appeal to the Supreme Court of North Carolina had not been withdrawn in conformity with the requirements of G.S. 15-84, and that he was entitled to an appeal on the merits within a reasonable time. Decision on the

other two allegations was reserved pending state appellate review. We allowed *certiorari* and the case is here for review on the merits.

Willa Dean Simmons was the State's principal witness. Her testimony tends to show the following facts. She had been living in adultery with the defendant at the house on Snake Island Road, where the killing occurred, since November 1960. In January 1961 David Preston (Pop) Williams, the deceased, began staying at this home. Six weeks before Williams was killed, Herman Lewis (Pee Wee) Watson began staying there. Williams and Watson helped defendant make and sell liquor, receiving as wages only the food they ate and the liquor they drank.

On 8 December 1961 Williams and Watson arose early and went to defendant's blockade still which was located in the woods about a mile from the house. Watson returned about 3:45 p.m. and brought one case of whiskey with him. Defendant inquired about the remainder of the whiskey and Watson "said he supposed the rest was with Pop." Soon thereafter, Williams came out of the woods and into the yard and defendant inquired about the remainder of the whiskey. Williams said, "Come with me and I'll show you where it is at." Defendant had been drinking and thereupon began kicking and cursing Williams. Defendant knocked him down, tore off his clothing, beat him with his fists, and then held a live electric wire against his flesh. Defendant told Williams to get up but he was unable to do so. While Williams was lying flat on his back, defendant struck him in the chest two or three times with an eight pound maul.

By this time Williams was completely helpless. Defendant seemed infuriated that Williams would not get up when commanded to do so. Willa Dean Simmons suggested that they should take Williams in the house because it was cold and he was freezing. Defendant said he would warm him up and thereupon poured kerosene into a weed burner, lighted it, and turned it on so that the flame was shooting out of the burner about a foot or more, and burned Williams all over his body, singeing the hair on his head to its roots, finally placing the burner under Williams' legs in the area of the buttock and walked away, leaving it there. This torture continued for an hour or more, during which time Willa Dean Simmons was

begging defendant to cease, was attempting to aid Williams, and was trying to put out the flame in the weed burner. Defendant was angry because Williams had left some of the liquor in the woods and was angry at Willa Dean Simmons because of her acts of mercy. He then poured alcohol over Williams' body, said he always knew that fire would move a dead man, and forced Willa Dean Simmons to put a match to the alcohol. It caught fire and burned across the bottom of his stomach.

Finally, Willa Dean Simmons put Williams to bed and went to a store to buy ointments for his burns. She returned and put medication on his back where he was beaten and applied pine oil to the burns on his body and legs. She told defendant that Williams' ribs were broken, that he was going to die, and requested permission to get a doctor. Defendant said "aw hell, I have heard broke ribs and doctor until I am sick of it. . . . I am going to doctor your head, if you don't shut up . . . just take a drink and shut up." Thereupon Willa Dean Simmons replied, "I might as well join the crowd, get drunk and go to bed. One passing out at the table, and you crazy and Pop beat and burned to death"; and she drank about a half pint of whiskey and went to bed.

The next morning Williams was dead. Defendant instructed Watson to rake the yard and he did so, burning the pieces of clothing belonging to Williams. Defendant thereupon instructed Watson and Willa Dean Simmons to say that Williams came home in his bruised, beaten, and burned condition; that defendant was in bed and didn't know anything about it—"just say that Pop came home in that condition." Defendant and Willa Dean Simmons then went to town to get the undertaker. She told the undertaker and the coroner what defendant had instructed her to say. Later, however, she told SBI agents substantially what is narrated above and contained in her testimony in court. She told the officers she was afraid of defendant and asked for protective custody.

A. D. Peacock, the undertaker, testified that on 9 December 1961 at 10 a.m. defendant came to his funeral home and asked him if he would like to have some business, stating that there was a dead man at his house; that the man had fallen off a bed, probably hurt himself and died, and he found him the

next morning; that the dead man had a fight with some boys
the night before. He further testified that he later embalmed
the body of David Preston Williams at which time he found
numerous burns and bruises on it.

J. B. Long, the coroner, testified that on 9 December 1961,
he went to defendant's home and there saw the body of David
Preston Williams. The feet were under the edge of the bed and
the head almost out the door. The body was dressed in a pajama
top only. He observed burns and abrasions all over the body.
The hair was singed off the top of the head. The coroner had
the body delivered to the funeral home where he examined it
more thoroughly and then had it removed to the Columbus
County Hospital. There Dr. George Lumb, a pathologist, per-
formed an autopsy.

Dr. Lumb testified that the body was covered from head
to foot, both in front and behind, with small lacerations and
abrasions; that the abrasions were apparently second-degree
burns and these were all over the body so it was impossible to
count them; that a larger area, approximately eight inches by
five inches, in the general area below the buttock was definitely
burned; that there was a severe burn on the left forehead at the
hairline and the hair in the central part of the head was singed
and burned to the roots; that there was burning of the left
ear and the right cheek, and the scrotum was discolored and
charred and appeared also to have been burned; that there was
considerable bruising of the chest on both sides; that the collar-
bone and the third through the eighth ribs on the left side
and the eighth and ninth ribs on the right side were fractured;
that there was a pint of blood in both chest cavities; that the
ribs were completely fractured and the clavicle was broken
with considerable separation; that the body had been dead for
more than twenty-four hours. It was Dr. Lumb's opinion that
Williams died of respiratory failure, terminal shock, in the
presence of multiple chest injuries with fractures of the ribs
and multiple burns, lacerations, and abrasions scattered over
the entire body surface.

Ben Duke, Sheriff of Columbus County, testified that he
arrived at defendant's house at about 11 a.m. on the date alleged
and made an investigation of the premises. The smell of kero-
sene was on the ground outside the house. A maul and a weed

burner were on the back porch. The sheriff followed boot tracks, the same size as a pair of boots on the back porch, and eventually came upon a still in the woods about three quarters of a mile from the house. There he found three barrels of mash. Approximately 150 yards from the still he found a case of whiskey and 250 yards from the still he found a second case with eight jars of whiskey in it. He later returned to defendant's house and took possession of the maul. The weed burner had been moved and he was never able to find it.

SBI Agent Satterfield interviewed defendant on 13 December 1961, told him he was a police officer investigating the case and would tell in court anything defendant told him. Defendant stated he was not drunk on the occasion in question, was not insane, and that there was no evidence of insanity in his family. Defendant told him he did not know what happened to the deceased; that he had no knowledge of a liquor still; and that Willa Dean Simmons, his girl friend, slept in one room and he in the other. Agent Satterfield talked with Willa Dean Simmons in the presence of defendant and she said: "Leo, I have got to tell the truth, this is on my conscience." She then related to Agent Satterfield in defendant's presence substantially what she testified to on the witness stand.

The testimony of Herman Lewis Watson corroborates the testimony of Willa Dean Simmons in all essential respects. Watson said he was drinking and that defendant was drinking at the time and appeared to be angry. He said he was afraid of the defendant.

Defendant offered no evidence. From a judgment of life imprisonment in accordance with the jury's verdict, defendant appealed to the Supreme Court assigning errors noted in the opinion.

*Charles H. Yarborough, Jr., and Jacob W. Todd, Attorneys for defendant appellant.*

*Robert Morgan, Attorney General, by Edward L. Eatman, Jr., Staff Attorney, for the State.*

HUSKINS, Justice.

Defendant assigns as error that the trial court failed to instruct the jury on the issue of manslaughter and limited the

jury in its deliberations to one of three verdicts, to wit: murder in the first degree (with or without recommendation as to punishment), murder in the second degree, and not guilty.

[1, 2] Where it is permissible under the bill of indictment to convict defendant of a lesser degree of the crime charged, *and there is evidence to support a milder verdict,* defendant is entitled to have the different permissible verdicts arising on the evidence presented to the jury under proper instructions. *State v. Robinson,* 188 N.C. 784, 125 S.E. 617 (1924) ; *State v. Keaton,* 206 N.C. 682, 175 S.E. 296 (1934) ; *State v. Riera,* 276 N.C. 361, 172 S.E. 2d 535 (1970). Error in failing to submit the question of defendant's guilt of lesser degrees of the same crime is not cured by a verdict of guilty of the offense charged because, in such case, it cannot be known whether the jury would have convicted of a lesser degree if the different permissible degrees *arising on the evidence* had been correctly presented in the court's charge. *State v. Davis,* 242 N.C. 476, 87 S.E. 2d 906 (1955) ; *State v. Childress,* 228 N.C. 208, 45 S.E. 2d 42 (1947).

[3] The foregoing principle applies only in those cases where there is evidence of guilt of the lesser degree. *State v. Smith,* 201 N.C. 494, 160 S.E. 577 (1931). Where all the evidence tends to show that the crime charged in the indictment was committed, and there is no evidence tending to show commission of a crime of less degree, the principle does not apply and the court correctly refuses to charge on the *unsupported lesser degree. State v. Manning,* 221 N.C. 70, 18 S.E. 2d 821 (1942) ; *State v. Sawyer,* 224 N.C. 61, 29 S.E. 2d 34 (1944) ; *State v. Brown,* 227 N.C. 383, 42 S.E. 2d 402 (1947) ; *State v. Bell,* 228 N.C. 659, 46 S.E. 2d 834 (1948). *Compare State v. Freeman,* 275 N.C. 662, 170 S.E. 2d 461 (1969), which discusses the law in this and other jurisdictions when there *is* evidence sufficient to require submission of manslaughter and the jury convicts of murder in the first degree.

Defendant does not contend on this appeal that the element of malice is not shown by the evidence. Rather, his contention is that the evidence as a whole gives rise to a permissible inference that he did not *intentionally* kill the deceased. Therefore, defendant argues, the jury could have found him guilty of manslaughter and, on authority of *State v. McNeill,* 229

N.C. 377, 49 S.E. 2d 733 (1948), the judge was required to so instruct the jury.

[3-6] The record in this case is barren of any evidence of manslaughter. Manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *State v. Baldwin,* 152 N.C. 822, 68 S.E. 148 (1910) ; *State v. Benge,* 272 N.C. 261, 158 S.E. 2d 70 (1967). Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889 (1963). Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. G.S. 14-17; *State v. Lamm,* 232 N.C. 402, 61 S.E. 2d 188 (1950).

[7-9] The intentional use of a deadly weapon as a weapon, when death proximately results from such use, gives rise to the presumptions that (1) the killing was unlawful and (2) done with malice, and an unlawful killing with malice is murder in the second degree. Here, all the evidence tends to show that defendant stubbornly continued over a period of hours to curse the deceased and to assault his helpless victim time after time with various deadly weapons while Willa Dean Simmons was begging him to cease and desist. By these persistent assaults without the slightest provocation he inflicted mortal wounds proximately causing the death of his victim. This evidence affords no basis upon which defendant could be found guilty of manslaughter. Upon this evidence the presumptions arose, and it was then incumbent upon defendant, in keeping with legal principles too well settled to require repetition, to satisfy the jury of the truth of facts which would mitigate the killing to manslaughter or excuse it altogether. He offered absolutely nothing in mitigation of his crime.

In the following language from *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322 (1955), Justice Bobbitt (now Chief Justice) wrote the applicable law:

"When the killing with a deadly weapon is admitted or established, two presumptions arise: (1) that the killing was unlawful; (2) that it was done with malice; and an unlawful killing with malice is murder in the second degree. In *State v. Gregory,* 203 N.C. 528, 166 S.E. 387 [1932], where the defense was that an *accidental* discharge

of the shotgun caused the death of the deceased, it was stated that the presumptions arise only when there is an *intentional killing* with a deadly weapon; and since the *Gregory case* it has been often stated that these presumptions arise only when there is an intentional killing with a deadly weapon. But the expression, *intentional killing,* is not used in the sense that a specific intent *to kill* must be admitted or established. The sense of the expression is that the presumptions arise when the defendant *intentionally assaults* another with a deadly weapon and thereby proximately causes the death of the person assaulted. [Citations omitted] A specific intent *to kill,* while a necessary constitutent of the elements of premeditation and deliberation in first degree murder, is not an element of second degree murder or manslaughter. The intentional use of a deadly weapon as a weapon, when death proximately results from such use, gives rise to the presumptions."

*Accord State v. Barber,* 270 N.C. 222, 154 S.E. 2d 104 (1967) ; *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969) ; *State v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337 (1965) ; *State v. Winford,* 279 N.C. 58, 181 S.E. 2d 423 (1971).

*State v. McNeill, supra* (229 N.C. 377, 49 S.E. 2d 733), relied on by defendant, was decided prior to decision in *State v. Gordon, supra.* Inexact expressions therein contrary to the legal principles laid down in *Gordon* are disapproved and may not be considered authoritative on the facts disclosed by the evidence in this case.

[10, 11] It is clear that, upon the State's evidence, defendant was guilty of at least murder in the second degree. The additional ingredient of premeditation and deliberation necessary in first degree murder may be inferred from the vicious and brutal circumstances of the homicide, *e.g.,* lack of provocation, threats before and during the occurrence, infliction of lethal blows after the victim had been felled and rendered helpless, and conduct of the defendant before and after the killing. *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970) ; *State v. Hamby,* 276 N.C. 674, 174 S.E. 2d 385 (1970) ; *State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484 (1969) ; *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652 (1969) ; *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769 (1961) ; *State v. Stanley,* 227 N.C. 650, 44 S.E. 2d

State v. Duboise

196 (1947). Moreover, when a homicide is perpetrated by means of torture, as here, premeditation and deliberation are presumed and defendant is guilty of murder in the first degree. *State v. Dunheen,* 224 N.C. 738, 32 S.E. 2d 322 (1944). "A murder which shall be perpetrated by means of . . . torture . . . shall be deemed to be murder in the first degree. . . . " G.S. 14-17.

For the reasons stated, we hold that the trial court correctly refused to submit the issue of manslaughter to the jury.

[12] In declining to submit manslaughter as a possible verdict, the court used the following language: "And, gentlemen, I instruct you there is in this case, no evidence upon which a verdict of manslaughter could be based and you will not be concerned further with that degree of homicide." Defendant assigns this instruction as error, contending that it constitutes an expression of opinion on the credibility of the evidence in violation of G.S. 1-180. It suffices to say that the judge is required to declare and explain the law arising on the evidence. It is not an expression of opinion, but rather the duty of the trial judge, where the evidence so warrants, to inform the jury that manslaughter does not arise on the evidence in the case. It is the duty of the judge to determine, in the first instance, if there is any evidence or any inference fairly deducible therefrom tending to prove one of the lower grades of murder. Having done so, and having concluded that there was no basis for submission of manslaughter to the jury, it was the duty of the judge to instruct it accordingly. *State v. Spivey,* 151 N.C. 676, 65 S.E. 995 (1909). *Accord State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885 (1969). This assignment is overruled.

The brief filed for defendant by his court-appointed counsel does not discuss two allegations made by defendant in his proceedings in the United States District Court, to wit: (1) that evidence introduced at his trial was obtained by an unlawful search and seizure and (2) that a statement improperly extracted from him was introduced into evidence at his trial. Defense counsel stated during argument of the case that those matters had not been raised and discussed in the brief because there was nothing in the record to support them. Nevertheless, defendant has written this Court directly, calling attention to the omission and reasserting those contentions. He does not specify the items allegedly illegally seized, but the record

shows that several items were offered in evidence against him, including the maul, the trousers and cap worn by the deceased, and numerous photographs showing the scene of the crime, the body of the deceased, and the liquor still down the road from the house. The record shows no objection to the admission of any of the exhibits or to the testimony of law enforcement officers describing the scene of the crime.

[13] Moreover, it appears from the record that defendant reported the death to the undertaker who notified the coroner. Defendant returned to the scene of the crime with the coroner who, after arriving at the scene, called the sheriff. When the sheriff arrived about 11 a.m., he entered defendant's home and viewed the surrounding premises. Defendant was present and made no objection. The record discloses that the maul and weed burner were in plain view on the back porch. The trousers worn by the deceased were in plain view in the room where the body lay. No search was made to discover these items. None was necessary. It is settled law that under circumstances requiring no search the constitutional immunity from unreasonable searches and seizures never arises. "Where no search is required, the constitutional guaranty is not applicable. The guaranty applies only in those instances where the seizure is assisted by a necessary search. It does not prohibit a seizure without warrant where there is no need of a search, and where the contraband subject matter is fully disclosed and open to the eye and hand." 47 Am. Jur., Searches and Seizures, § 20; *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376 (1968); *State v. Kinley,* 270 N.C. 296, 154 S.E. 2d 95 (1967); *State v. Coffey,* 255 N.C. 293, 121 S.E. 2d 736 (1961); *State v. Giles,* 254 N.C. 499, 119 S.E. 2d 394 (1961).

[14] The record is barren of any evidence to support defendant's assertion that a statement was "improperly extracted from him" and evidence thereof offered at his trial. Defendant voluntarily made various self-serving declarations to the officers, all of which tended to completely exonerate him, and these were related to the jury by the officers who testified in the case. They were incompetent, even for corroborative purposes, since defendant did not go upon the stand. Even so, their admission was favorable to defendant and he is in no position to complain. We find no merit in these contentions.

Defendant was fortunate to have been tried before a compassionate jury. In the trial below we find

No error.