STATE OF NORTH CAROLINA v. WILLIAM HARRISON BOLIN

No. 114

(Filed 16 June 1972)

1. **Homicide § 14— intentional shooting causing death — second degree murder**

    If defendant intentionally shot decedent and thereby inflicted bullet wounds which proximately caused decedent's death, nothing else appearing, defendant would be guilty of murder in the second degree.

2. **Criminal Law § 104— motion for nonsuit — consideration of evidence**

    On a motion for judgment as in case of nonsuit, the evidence must be considered in the light most favorable to the State; contradictions and discrepancies, even in the State's evidence, are matters for the jury and do not warrant nonsuit.

3. **Criminal Law §§ 90, 104— statement by defendant — introduction by State — showing that facts are different**

    The introduction in evidence by the State of a statement made by defendant which may tend to exculpate him does not prevent the State from showing that the facts concerning the crime were different from what the defendant said about them.

4. **Homicide § 14— self-defense — burden of proof**

    If and when the jury found that defendant intentionally shot decedent and thereby inflicted wounds which proximately caused his death, it was incumbent on defendant to show to the satisfaction of the jury that he acted in self-defense and that in doing so he used no more force than was or reasonably appeared necessary under the circumstances to protect himself from death or great bodily harm.

**5. Homicide § 21— self-defense as matter of law — insufficiency of evidence**

Written statement signed by defendant, which was offered into evidence by the State, to the effect that defendant and his companion had an argument with decedent in a poolroom, that decedent stated that he had a "forty-five and a thirty-two" in his car and threatened to shoot defendant, that defendant went by his home and got a shotgun, that defendant and his companion returned to the poolroom to offer an employee of the poolroom a ride home, that the operator of the poolroom told defendant that decedent was still there and that he had better watch out, that defendant parked in a nearby parking lot, that decedent came out of the poolroom toward defendant's truck and said something like, "I'm going to teach you some manners," that defendant stuck his gun out the window and told decedent he had better look at what defendant had and stop, that decedent put his hand in his pocket and defendant thought he was going to get a knife or gun, and that defendant shot decedent when he kept coming and was about five feet away, *held* insufficient to establish as a matter of law that defendant acted in self-defense, the question of self-defense being for the jury to determine.

**6. Criminal Law § 46— evidence of flight**

Defendant's flight from the scene of a killing was competent for consideration by the jury in connection with other circumstances in passing upon whether defendant was guilty of unlawful homicide, but was not admissible to prove premeditation and deliberation.

**7. Homicide § 21— first degree murder — sufficiency of evidence**

The State's evidence was sufficient to require the submission to the jury of an issue of defendant's guilt of first degree murder where it would support findings by the jury that defendant and his companion had an argument with decedent in a poolroom, that, contrary to defendant's contention, decedent did not threaten defendant or his companion with a deadly weapon of any kind and did not have such a weapon, that defendant and his companion drove to defendant's home, got defendant's shotgun, returned to the poolroom area and parked in a nearby parking lot, that defendant returned for the purpose of confronting decedent, that defendant, with the shotgun in his lap, waited until decedent emerged from the poolroom, that decedent, after going to his car, was prompted or induced in some manner to approach defendant's truck, that decedent had a beer can in his hand and no weapon on his person, and that as decedent walked toward defendant's truck, defendant shot him and immediately drove away.

APPEAL by defendant from *Long, J.,* November 22, 1971 Session of FORSYTH Superior Court.

Defendant was indicted, in the form prescribed by G.S. 15-144, for the murder of Buiel A. Wiles on September 9, 1971.

It was stipulated that Wiles died on September 9, 1971, as the result of a gunshot wound inflicted by defendant.

The only evidence was that offered by the State. It consists of exhibits and the testimony of each of the following witnesses: Donald W. Allred (Allred); Roy Tinley Scales (Scales); Harold Gray Huff (Huff); James H. Teele (Teele); and C. E. Cherry (Cherry). Allred, Teele and Cherry are members of the Police Department of Winston-Salem. Scales is the owner of Stadium Drive Lunch. Huff works there as an employee of Scales. Exhibits include (1) a statement signed by defendant, and (2) a diagram showing what the pathologist would testify as to "the point of injury and the angle trajectory after the pellets entered the body."

There was evidence tending to show that Stadium Drive, Winston-Salem, North Carolina, runs north and south; that Stadium Drive Lunch and its unpaved parking lot are north of Kashway Food Store and its paved lot, all being on the west side of Stadium Drive; that a grass median which separates the parking lots is 18 feet wide and slopes toward the Stadium Drive Lunch parking lot; and that it is 86 feet from the north side of the median to the south side of the Stadium Drive Lunch building.

The testimony of each witness, summarized except when quoted, is set forth below.

### ALLRED'S TESTIMONY

In response to a call which he received at 4:02 a.m., Allred (accompanied by J. C. Caudin, then a member of the Winston-Salem Police Department) went to the Stadium Drive Lunch (1716 Stadium Drive), arriving at 4:05 a.m. He found the lifeless body of Wiles lying on the southern edge of the grass median, 104 feet south of the Stadium Drive Lunch building and 20 feet west of the sidewalk along the west side of Stadium Drive.

Allred searched Wiles's body and the adjacent "well-lighted" area. He found "a Budweiser beer can," containing approximately two ounces, a foot from Wiles's right arm. He found no knife or gun on Wiles or in the vicinity of his body. He also searched Wiles's Thunderbird car, including the trunk, but found no weapon. The Thunderbird was parked close to

the south side of the Stadium Drive Lunch building. The keys to the Thunderbird were in the ignition.

Allred saw no people at the scene where Wiles's body was found except Scales, Huff and Ted Abrum Gerrey (Gerrey). When Allred arrived, Gerrey and Scales were inside the building. Huff came out "of the drive" when Allred drove up.

### SCALES'S TESTIMONY

The Stadium Drive Lunch building fronts on Stadium Drive. It consists of two rooms. There are tables and a bar in the front room where beer and sandwiches are sold. There is a pool table in the back room. Scales and Huff, his employee, were operating this place of business on the night of September 8th and during the early morning of September 9th.

Defendant and Gerrey entered the Stadium Drive Lunch together. Wiles came in later. They played pool in the back room and stayed until all other customers had left. They played pool in the back room until Scales "told them [he] was closing" and "sent them off." Defendant and Gerrey left first. When they left the building, Scales went out "the back side door," which was between the south side of the poolroom and Stadium Drive Lunch parking lot, "to empty some trash." He saw defendant and Gerrey get in a truck and leave. Wiles stayed there "for a while" and talked to Scales and Huff while they were "cleaning the place up." When Wiles left the building, Scales "closed the place up and locked the door." "A few minutes later" Scales "heard a shot." Huff opened the back side door and left the building. Upon his return, Huff told Scales that Wiles had been shot and Huff then "called the officers and ambulance." When the officers arrived, Scales "went down to where the body [of Wiles] was." Scales noticed that the left front door of Wiles's car was open. During the evening, Scales had been "up front most of the time," not paying "a great deal of attention" to what was going on in the poolroom. He heard no argument between defendant and Wiles. He did not hear Wiles say anything "about having a gun" or "about threatening to shoot the defendant Bolin at any time that evening or at any other time." He heard no discussion between defendant and Wiles regarding a dollar bet on pool. At or about the time they were leaving, he heard them talking "about a shot that somebody had made," but knew of "no heated argument" between them.

Although admittedly uncertain as to the time (times) and time intervals, Scales testified that defendant and Gerrey came into his place between 9:00 and 10:00 p.m. on September 8th; that Wiles arrived shortly after midnight; that defendant and Gerrey left about 2:45 a.m.; that Wiles left from fifteen to forty-five minutes later; that he heard the shot from five to fifteen minutes later; and that Huff was gone from three to five minutes before returning to call the officers and ambulance.

### HUFF'S TESTIMONY

Bolin and Wiles "knew one another" and "always seemed to be friends." Huff "heard no argument between Wiles and Bolin" whenever he "went back into the pool area." When he went back "to start cleaning up," he heard a discussion over a shot on the pool table. Defendant and Wiles had a dollar bet on whether Wiles could make a certain shot, and Wiles missed the shot. There "wasn't a heated argument," but "just poolroom talk is about all." "[A]s a result of the argument," Wiles passed back to defendant a dollar which defendant had previously given him. Defendant and Gerrey left the Stadium Drive Lunch together. Wiles stayed inside the place approximately 10-20 minutes and then left. Wiles had a Budweiser beer can in his hand "[w]hen he left the poolroom part of the place." "Something like ten or fifteen minutes after [Wiles] left," Huff heard a shot and thereupon went out the side door. He did not see a vehicle of any kind except Wiles's Thunderbird. He noticed that "[t]he door on the driver's side was open." Huff walked up to where Wiles's body was lying, saw that he was dead, and came back and called the police. Huff was outside "a minute, a minute and a half."

Huff "did not hear any kind of threats at all that Wiles was going to shoot Bolin," and "did not hear any statements of whether or not [Wiles] had a forty-five or thirty-two in his car or anything like that." Huff did not hear Wiles "tell Bill Bolin he was going to shoot him," and "did not see any guns outside, inside, or anywhere else." Huff also testified that Gerrey was not in the Stadium Drive Lunch building when he heard the shot but was there when he returned. Scales had been taking Huff home whenever he helped him and Huff planned to go home with Scales that evening.

### TEELE'S TESTIMONY

On September 9th, after 3:00 a.m., Teele was driving south on Stadium Drive at about ten miles an hour. In passing, he observed "a couple of cars" parked in the Stadium Drive Lunch parking lot and a "light-colored pickup truck" parked in the Kashway Food Store parking lot. The headlights on the pickup were shining toward Stadium Drive. He observed that there were two people in the pickup but could not tell "whether they were black or white." Ten or fifteen minutes later, when he was approximately a mile away, Teele heard a radio broadcast "of a shooting at the Stadium Street Lunch." He "turned around," drove back and pulled into the parking lot of the Stadium Drive Lunch. As he started to get out of his car, "a person" standing at or near the front door of Stadium Drive Lunch pointed toward Kashway Food Store and said, "It happened up that way." He headed south again on Stadium Drive and started to pull into the parking lot at Kashway Food Store "when several other cars arrived at the scene." He had seen no one there when he arrived at Stadium Drive Lunch. He saw the body "on the north edge of the parking lot with the upper portion . . . turned to the north . . . into a grassy area and the lower part . . . extending onto the parking lot." (Note: Apparently, Teele left the scene without participating with other officers in the investigation.)

### CHERRY'S TESTIMONY

At 4:30 a.m. on September 9th, Detective Sergeant Cherry was assigned to investigate the killing of Wiles. After talking with Scales and Huff, he attempted without success to locate defendant, checking at his home and "at the Post Office where he was employed."

On Sunday, September 12th, about 2:00 a.m., at his residence, Cherry received a telephone call from a man who identified himself as defendant's brother. As a result, the sheriff met defendant, one of defendant's brothers and defendant's attorney, at 9:00 a.m. on Sunday, September 12th, in the office of the Detective Division. Defendant was advised fully of his constitutional rights and signed "a waiver of rights," which was witnessed by defendant's brother. Defendant then made a statement which was taken down in shorthand, transcribed, submitted to defendant for corrections, then signed by defendant

State v. Bolin

and witnessed by Cherry and by defendant's brother. Defendant's statement, which was admitted in evidence without objection, is quoted below.

"I was leaving to go home. I was down at Southside with Mr. Yates in the six hundred block of Waughtown adjacent to McLean Trucking Company just to the east side. They have a shuffleboard game in there and I was playing a game of shuffleboard and one or two other people got in the game. I don't know their names, but one was a blond-headed girl and a man named Gene Dudley was watching. There were two more, but I don't know their names. This man that I know, Teddy Gerrey, he asked if I would give him a ride to Roy's Lunch on Stadium Drive, about the eight hundred block. I said, 'Yes, I will give you a ride,' so we arrived down there and I went in and sat down and was just sitting there and Ted asked if I would like to play a game of pool and I said, 'Yes, I'll play you a game,' so we went back to the poolroom to play a game of pool and some of the people that were there were Charlie Cryner and Gene Dudley. I played a couple of games and Ted left the poolroom and somebody said, 'Let's just play for a beer,' and I said, 'Okay, let's play and the loser will buy the beer,' so, I won a game or two and then Bill Wiles won a game. We played three or four games.

"After nearly through the last game, I offered to bet Bill Wiles a dollar that he would not make the last ball and buy a beer. Bill Wiles was not going to win the game because this dark-haired guy about five feet seven inches or five feet eight inches about a hundred eighty-five or ninety pounds was going to win. He was a gentle acting man. This was about 12:30. I knew that I should have already been home. I wasn't paying any attention to the time. When Bill lost, he got awfully mad and he was going to jump all over me, and Ted Gerrey told him he heard what was going on and the man was right and to leave me alone. I said, 'Bill, listen to the man or ask this other fellow sitting here.' He said yes, he heard what was said and it was just like what he said and then Bill jumped on Ted. He didn't ever hit me. He jumped on Ted. Then, Bill Wiles said, 'If you people don't like what I do, I have got a forty-five and a thirty-two out in the car and I'll just blow your brains out.' Huff and Ted Gerrey heard Bill Wiles say this. Then, the dark-haired man pushed Bill Wiles out of the door and

took him to the car. So, I walked up to the front and I said hello to Charlie Cryner. He works at McLean's and I was talking to him and he was kidding Harold Huff and I was going to ask Harold Huff if he wanted a ride home and Charlie said, 'Do you need to borrow any money,' and I said, 'No, I have got some money in my pocket.' So, I was going to see if Huff wanted a ride home, so I told Ted to come on and I would give him a way home. He said, 'That man is going to do what he says. Bill means what he says.' So, I went by my home and picked up my shotgun and Ted was with me.

"So, I stopped by Roy's and parked out front and Roy walked out the front door and I said, 'Is Huff still there?' and Roy Scales said, 'Look out, that fellow is still in there and you had better watch out. You had better not park here.' So, I just pulled on down the street and stopped on the parking lot of Kashway Food Store and my truck was headed north of the luncheon. Just as soon as I got stopped, Bill Wiles came tearing out that door and he came up the bank walking south. He came out the side door and walked south towards my truck and he came up and looked at me and said something to me, I can't remember, but it was something like 'I'm going to teach you some manners,' and he kept on walking and he reached in his pocket and I thought he was going to get a knife or gun. I didn't know what he was doing. I thought about leaving, but I didn't know what he was going to do. I said, 'Bill, you better stop where you are,' and he was about four or five feet away from me. He was on the left side of my truck. I just told him he better stop, but he didn't stop. He just kept on coming and he just moved faster. I had my shotgun in my lap and I just raised my gun up and shot him. The first time I told him to stop, I stuck my gun out the window and told him he had better look at what I had and stop, but he didn't. He just put his hand in his pocket. I just cut loose when he kept on coming and he fell in front of my truck. He was about five feet away when I shot him. Ted Gerrey was in the truck at this time. He jumped out of the truck and ran in the luncheon in the back door and told me to go on so I did.

"I don't know if anybody was drinking beer in there or not. Gerrey was present when Bill Wiles told me he had a thirty-two and a forty-five in his car and so was Huff. They heard Wiles say he would blow my brains out. After I left the parking lot at the luncheon, I went to Thomasville and

State v. Bolin

came back through High Point and stopped in High Point and cashed a check and got some gas at a service station and came back halfway between Winston-Salem and High Point and drove down Cumley Road and drove to a sawmill and got a hose and tried to commit suicide. I stayed there for two nights. Then, Saturday night, I came back home. I figured I had better get it straight."

After signing the statement, defendant was "taken into custody and charged with the offense" for which he was tried.

Cherry testified that defendant told him that Gerrey was in the truck when defendant shot Wiles; and that defendant had thrown the gun "in Salem Creek."

Cherry also testified that it was exactly 2.2 miles from Stadium Drive Lunch to where defendant lived.

In his cross-examination of Cherry, defendant's counsel elicited testimony which tended to show the following: Scales had told Cherry that Wiles and defendant "had started arguing after they started closing up and he [Scales] went back and told them he didn't want any trouble, they would have to leave." After defendant was "taken in custody," Gerrey was picked up and brought to the Police Department. After reading defendant's statement, Gerrey said "it was a true and accurate account of what had taken place"; "that when they had left Roy's Lunch that he was planning to go home but that the defendant drove to his house instead and got the shotgun and came back."

The jurors were instructed to return one of the following verdicts: "guilty of first degree murder; or guilty of first degree murder with a recommendation of life imprisonment; or guilty of second degree murder; or guilty of manslaughter; or not guilty."

The jury returned a verdict of "guilty of first degree murder with a recommendation of life imprisonment." Whereupon, the court pronounced judgment which imposed a sentence of life imprisonment. Defendant excepted and appealed.

*Attorney General Morgan and Associate Attorney Sauls for the State.*

*White, Crumpler & Pfefferkorn, by Fred G. Crumpler, Jr., Michael J. Lewis and G. Edgar Parker, for defendant appellant.*

BOBBITT, Chief Justice.

Defendant assigns as error (1) the court's denial of his motion under G.S. 15-173 for judgment as in case of nonsuit, (2) the court's denial of his motion as in case of nonsuit in respect of the charge of murder in the first degree, and (3) portions of the court's charge to the jury.

The applicable substantive law is well settled and need not be restated. For the elements of murder in the first degree, see *State v. Reams,* 277 N.C. 391, 401-02, 178 S.E. 2d 65, 71 (1970), and cases cited. For the elements of murder in the second degree and of voluntary manslaughter, see *State v. Duboise,* 279 N.C. 73, 81-2, 181 S.E. 2d 393, 398 (1971), and cases cited. For the legal principles applicable to the right of self-defense, see *State v. Wynn,* 278 N.C. 513, 519, 180 S.E. 2d 135, 139 (1971), and cases cited. Consideration of the charge shows that Judge Long instructed the jury in substantial accord with our decisions.

[1] The evidence, inclusive of the stipulation and of portions of defendant's written statement of September 12th, was sufficient to support a finding that defendant intentionally shot Wiles and thereby inflicted bullet wounds which proximately caused Wiles's death. If so, *nothing else appearing,* defendant would be guilty of murder in the second degree. *State v. Duboise, supra* at 81-2, 181 S.E. 2d at 398, and cases there cited. Defendant contends that this statement of September 12th discloses that he acted within his legal right of self-defense; and, having offered the statement in evidence, the State is bound by the portions thereof which are favorable to defendant.

[2] On a motion for judgment as in case of nonsuit, the evidence must be considered in the light most favorable to the State. Contradictions and discrepancies, even in the State's evidence, are matters for the jury and do not warrant nonsuit. *State v. Murphy,* 280 N.C. 1, 7, 184 S.E. 2d 845, 849 (1971), and cases cited.

[3] "When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements." *State v. Carter,* 254 N.C. 475, 479, 119 S.E. 2d 461, 464 (1961), and cases cited. Accord: *State v. Gaines,* 260 N.C. 228, 232, 132 S.E. 2d 485, 487 (1963);

*State v. Bruton,* 264 N.C. 488, 499, 142 S.E. 2d 169, 176 (1965). The introduction in evidence by the State of a statement made by defendant which may tend to exculpate him, does not prevent the State from showing that the facts concerning the homicide were different from what the defendant said about them. *State v. Cooper,* 273 N.C. 51, 57, 159 S.E. 2d 305, 309 (1968), and cases cited.

[4-6] If and when the jury found that defendant intentionally shot Wiles and thereby inflicted bullet wounds which proximately caused his death, it was incumbent on defendant to show to the satisfaction of the jury that he acted in self-defense and that in doing so he used no more force than was or reasonably appeared necessary under the circumstances to protect himself from death or great bodily harm. Standing alone, the facts stated in defendant's statement of September 12th are insufficient to show as a matter of law that defendant was entitled to complete exoneration on the ground of self-defense. Considered in the light most favorable to defendant, these facts were sufficient only to permit the jury to find to its satisfaction that defendant so acted. In any event, when the testimony of Allred, Scales, Huff, Teele and Cherry is considered, the court properly denied defendant's motion for judgment as in case of nonsuit. In this connection, we note that defendant's flight from the scene of the killing was competent for consideration by the jury in connection with other circumstances in passing upon whether defendant was guilty of unlawful homicide but was not admissible to prove premeditation and deliberation. *State v. Payne,* 213 N.C. 719, 723-24, 197 S.E. 573, 576 (1938), and cases cited.

Having concluded that the facts narrated in defendant's statement of September 12th did not establish as a matter of law that he acted in self-defense, we turn now to consider whether the State's evidence was sufficient to require submission of murder in the first degree as a permissible verdict. The answer to this question requires an analysis of the evidence offered by the State other than defendant's statement of September 12th, with emphasis upon those portions which are in conflict, expressly or impliedly, with defendant's explanatory statement.

Defendant's explanation of the incident in the poolroom when Wiles missed the shot and lost the bet and of his depar-

ture from Stadium Drive Lunch and his return is as follows: Wiles got awfully mad and was going to "jump all over" defend- ant until Gerrey spoke up and told Wiles he had heard what was going on and asked Wiles to leave defendant alone. There- upon, Wiles "jumped on" Gerrey. Then, according to defend- ant's statement, "Wiles said, 'If you people don't like what I do, I have got a forty-five and a thirty-two out in the car and I'll just blow your brains out.' Huff and Ted Gerrey heard Bill Wiles say this." Thereupon, "the dark-haired man" pushed Wiles out of the door and took him to his car. Defendant then walked up to the front, talked with one Charlie Cryner, and "was going to ask Harold Huff if he wanted a ride home." He told Gerrey to come on and he would take him home. Gerrey said that Wiles was going to do what he said. Accompanied by Gerrey, defendant left Stadium Drive Lunch, went by his own home and picked up his shotgun. Defendant and Gerrey returned to the Stadium Drive area, first stopping in front of Stadium Drive Lunch. Scales walked out the front door and defendant asked, "Is Huff still there?" Whereupon, Scales told him: "Look out, that fellow is still in there and you had better watchout. You had better not park here." Defendant then pulled down the street, and stopped on the Kashway parking lot.

The testimony of Scales and of Huff is in sharp conflict with the foregoing explanation of defendant. They testified that they did not hear Wiles say anything about having "a forty-five or thirty-two in his car" and did not hear him make threats of any kind. Too, they testified explicitly that defendant and Ger- rey left Stadium Drive Lunch first and that Wiles was the last customer to leave. Their testimony contains no reference to a departure by Wiles under escort of a "dark-haired man," prior to the departure of Cryner, Bolin and Gerrey. Nothing in defendant's explanation indicates that he in fact asked Huff if he wanted a ride home. Huff's testimony was that he planned for Scales to take him home as usual. No testimony of Scales or of Huff indicates that either of them saw defendant or Gerrey between the time defendant and Gerrey left in defendant's truck and the later time when Wiles left the Stadium Drive Lunch building.

Defendant's explanation as to what occurred after he parked his truck on the Kashway parking lot was as follows: Just as soon as defendant stopped, Wiles came "tearing out" of

State v. Bolin

the side door and "came up the bank walking south" toward defendant's truck and said something like, "I'm going to teach you some manners." Wiles reached in his pocket and defendant thought Wiles "was going to get a knife or gun." Defendant thought "about leaving but . . . didn't know what [Wiles] was going to do." When Wiles was four or five feet away, defendant told Wiles he had "better stop" where he was. Wiles was on the left side of defendant's truck. Wiles did not stop but kept on coming, moving faster. When defendant first told Wiles to stop, defendant "stuck [his] gun out of the window and told [Wiles] he had better look at what [defendant] had and stop," but Wiles "just put his hand in his pocket." Defendant "just cut loose when [Wiles] kept on coming and [Wiles] fell in front of [defendant's] truck." Defendant shot Wiles when Wiles was "about five feet away." Gerrey was in the truck when defendant shot Wiles, but Gerrey "jumped out of the truck and ran in the luncheon in the back door and told [defendant] to go on so [defendant] did."

Although Scales and Huff were present when Wiles left, nothing in the testimony of either suggests that Wiles went "tearing out" of Stadium Drive Lunch. Huff testified that when Wiles came out of the poolroom he had a Budweiser beer can in his hand. Allred testified that he found no weapon of any kind on or near Wiles's body but did find "a Budweiser beer can" near his right arm. The diagram, tending to show "the point of injury and the angle trajectory after the pellets entered the body," indicates the shot entered the right anterior wall of Wiles's chest and coursed downward. This evidence, defendant's statement that Wiles "came up the bank walking south," and Allred's testimony as to where Wiles's body was found, permitted the inference and a finding that Wiles was shot as he approached the top of the bank.

Defendant's statement that Wiles came from his left is in accord with Teele's testimony that the lights of the truck on the Kashway lot were burning and headed toward Stadium Drive. Defendant's statement that Wiles came "tearing out" of the Stadium Drive Lunch "[j]ust as soon" as he stopped on the Kashway parking lot is in conflict with Teele's testimony that defendant had been parked there when Teele passed, which was 10 or 15 minutes before Teele heard the radio broadcast "of a shooting at the Stadium Street Lunch."

Cherry testified that Gerrey told him that the statement made by defendant was correct. This included a statement that Gerrey was in the truck with defendant when defendant shot Wiles. Circumstances testified to by other witnesses permit contrary inferences. According to Huff, Gerrey was not in the Stadum Drive Lunch building when he left to go where Wiles's body was lying. The truck left during the brief interval between the firing of the shot and the times when Huff and Allred viewed Wiles's lifeless body. When Huff returned, he found Gerrey inside the Stadium Drive Lunch building. Too, Allred testified that Gerrey and Scales were in this building when he arrived upon the scene.

There was evidence that the left door of the Thunderbird was open and that the car keys were in the ignition. It may be inferred from this evidence that Wiles, upon leaving the Stadium Drive Lunch, had gone first to the Thunderbird. Whatever may have induced him to leave the Thunderbird and approach defendant's truck, the fact that he had no weapon of any kind (unless a Budweiser beer can can be considered a weapon) and that defendant had and exhibited his shotgun negates rather than supports an inference that Wiles approached defendant's truck in a threatening and menacing manner.

[7] The foregoing evidence would permit and support jury findings that there was an argument in the poolroom of the Stadium Drive Lunch between defendant and Gerrey on the one hand and Wiles on the other; that Wiles did not threaten defendant or Gerrey with a deadly weapon of any kind and did not have such a weapon; that defendant and Gerrey left in defendant's truck, leaving Wiles inside the Stadium Drive Lunch building; that, instead of taking Gerry home as originally planned, defendant drove to his own home, 2.2 miles away, and got his shotgun; that, armed with his shotgun, defendant and Gerrey returned to the Stadium Drive Lunch area and parked in the Kashway parking lot, with the truck headed toward the exit to Stadium Drive; that defendant returned to confront Wiles, not to offer Huff a ride; that defendant, with the shotgun in his lap, waited until Wiles emerged from the building; that Wiles, after first going to his Thunderbird car, was prompted or induced in some manner to approach defendant's truck; that, when he approached defendant's truck, Wiles had "a Budweiser beer can" in his hand and no weapon on his

State v. Bolin

person; that, as Wiles walked up the slope of the grassy median toward defendant's truck, defendant shot him and immediately drove away; that Gerrey was not in the truck when defendant drove away but shortly thereafter showed up inside the Stadium Drive Lunch building. We conclude that the evidence tending to show these facts was sufficient to require submission of guilty of murder in the first degree as a permissible verdict and to support such verdict.

Since defendant was not a witness, there was no cross-examination as to what was said in his statement. True, when the State introduced his extra-judicial statement, it was bound by what he said except insofar as it was contradicted and shown to be false. It was contradicted in material respects. In determining its credibility in these respects, the jury no doubt considered the fact that defendant had had the opportunity to reflect for more than three days before he gave any explanation as to what had occurred.

We have considered carefully each of defendant's assignments of error to the court's charge. As indicated above, none discloses prejudicial error. Elaboration of well-settled principles would serve no useful purpose.

Defendant having failed to show prejudicial error, the verdict and judgment will not be disturbed.

No error.